**UNITED STATES of America, Plaintiff,**

**v.**

**Yahya GOBA, Sahim Alwan, Shafal Mosed, Yaseinn Taher, Faysal Galab, Defendants.**

**United States of America, Plaintiff,**

**v.**

**Mukhtar Al–Bakri, Defendant.**

**Nos. 02–M–107, 02–M–108.**

United States District Court, W.D. New York.

Oct. 8, 2002.

William Clauss, Federal Public Defender, Rochester, NY, for Yahya Goba.

James P. Harrington, Harrington and Mahoney, Buffalo, NY, for Sahim Alwan.

Patrick J. Brown, LoTempio & Brown, Buffalo, NY, for Shafal Mosed.

Rodney O. Personius, Personius Melber LLP, Buffalo, NY, for Yasein Taher.

Joseph M. LaTona, Buffalo, NY, for Faysal Galab.

Timothy C. Lynch, U.S. Attorney's Office, Buffalo, NY, Martin J. Littlefield, AUSA, United States Attorney's Office, Buffalo, NY, William J. Hochul, Jr., U.S. Attorney for the WDNY, Buffalo, NY, for U.S.

## DECISION AND ORDER

SCHROEDER, United States
Magistrate Judge.

### PREAMBLE

Understandably, the infamous, dastardly and tragic deeds and events of September 11, 2001 have caused a maelstrom of human emotions to be not only released but to also create a human reservoir of strong emotional feelings such as fear, anxiety and hatred as well as a feeling of paranoia in many of the hearts and minds of the inhabitants of this great nation. These are strong emotions of a negative nature which, if not appropriately checked, cause the ability of one to properly reason to be impeded or to be blinded in applying our basic principles of law. In applying our democratic principles of law, the only blindness that is allowed and acceptable is that in which justice is blind to such things as a person's national origin or ethnic background or one's race or color or religious beliefs, because those characteristics play no role in deciding legal issues such as those that confront this Court today. If we truly believe in the principles espoused in this nation's Declaration of Independence and the United States Constitution, we must give more than lip service to those principles. We must fairly and fully apply those principles to each and every person entitled to their protection no matter how distasteful, frightening or loathsome it might be to some in doing so. We must always be vigilant to make certain that the rule of law, and not emotion, carries the day. There can be no doubt that the Constitution of the United States and our concepts of democracy provide sufficient strength and protection to bring citizens to justice without weakening our security. We must never adopt an "end justifies the means" philosophy by claiming that our Constitutional and democratic principles must be temporarily furloughed or put on hold in cases involving alleged terrorism in order to preserve our democracy. To do so, would result in victory for the terrorists.

### PRELIMINARY STATEMENT

This is indeed a unique case and one of first impression. The defendants herein are charged in a criminal complaint with having violated Title 18 U.S.C. §§ 2339B and 2. The defendants Goba, Alwan, Mosed, Taher and Galab had their initial appearance on the aforesaid complaint on September 14, 2002, and at that time, the government moved to have the defendants detained on the basis that they constitute a danger to the community and were a risk for flight.

The defendant Al–Bakri had his initial appearance on a separate complaint containing the same charges on September 16, 2002, and the government moved for his detention on the same grounds.

All of the defendants requested the Court to appoint counsel to represent them at taxpayers' expense, and this was done.[1]

Thereafter, the government renewed its motion to have all of the defendants herein detained on the basis that each defendant constituted a danger to the community and was a risk of flight. Each defendant, by his counsel, objected to detention and has requested the Court to release him on bail subject to suggested conditions. The defendants filed a "Joint Memorandum Of Law In Opposition To Detention Motion" on September 18, 2002 and a "Joint Supplemental Memorandum Of Law In Oppo-

---

1. Joseph Latona, Esq. was conditionally assigned to represent the defendant Galab until such time as a determination was made as to whether he would be retained by the defendant.

sition To Detention Motion" was filed on September 19, 2002. A detention hearing was held, and both the government and the defense have presented their positions and support of their positions by proffer. The hearing itself was conducted over a number of days, to wit, September 18, 19, and 20, 2002 and October 3, 2002. Counsel for the government filed a "Memorandum And Proffer In Support Of Pre–Trial Detention" on September 27, 2002 along with an affidavit of Assistant United States Attorney William J. Hochul, Jr. sworn to September 27, 2002 in further support of the government's motion. Counsel for the defendants filed another "Joint Memorandum Of Law In Opposition To The Government's Motion for Detention" on September 27, 2002, and individual filings were made on behalf of the defendants Goba, Alwan, Mosed, Galab, Taher and Al–Bakri on September 27, 2002. However, because of the government's additional filings asserting new information on September 27, 2002, counsel for the defendants requested an opportunity to respond to the content of those filings as part of the public hearing, which request was granted, and the matter was scheduled for October 3, 2002. On October 2, 2002, Assistant United States Attorney Martin J. Littlefield filed two separate affidavits sworn to on October 2, 2002, one of which modified the September 27, 2002 affidavit of Assistant United States Attorney Hochul with respect to quoted recitations from an audio cassette tape entitled "Koranic Recitations." The other was submitted in further support of the government's motion for detention and set forth additional information about the alleged travel arrangements of the defendants Taher, Galab and Mosed in April 2001.

Upon completion of the defendants' further proffers and the government's rebuttal to same on October 3, 2002, the matter was taken under advisement by the Court, and the following constitutes this Court's decision with respect to the government's motion to detain the defendants and each defendant's application to be released on bail.

## DISCUSSION AND ANALYSIS

■ At the outset, counsel for the defendants objected to the government's proceeding by proffer and requested that the government be required to offer testimony along with documentary evidence in support of this motion. This joint objection and request by the defendants was overruled and denied, and the Court allowed all parties to proceed by proffer.

It is well established in this circuit that proffers are permissible both in the bail determination and bail revocation contexts.

*United States v. LaFontaine*, 210 F.3d 125, 131 (2d Cir.2000). *See also United States v. Davis*, 845 F.2d 412, 415 (2d Cir.1988).

■ The government's motion to detain the defendants herein is based on its claim that each defendant is charged with a crime of violence, to wit, with having violated 18 U.S.C. § 2339B and therefore, each defendant constitutes a danger to the community and a risk for flight.

The Bail Reform Act limits the circumstances under which a district court may order pretrial detention. *See United States v. Salerno*, 481 U.S. 739, 107 S.Ct. 2095, 2102, 95 L.Ed.2d 697 (1987). A motion seeking such detention is permitted only when the charge is for certain enumerated crimes, 18 U.S.C. § 3142(f)(1) (crimes of violence, offenses for which the sentence is life imprisonment or death, serious drug offenses, or felonies committed by certain repeat offenders), or when there is a serious risk that the defendant will flee, or obstruct or attempt to obstruct justice. *Id.* § 3142(f)(2).

After a motion for detention has been filed, the district court must undertake a two-step inquiry. *See United States v. Shakur*, 817 F.2d 189, 194 (2d Cir.1987). It must first determine by a preponderance of the evidence, *see United States v. Jackson*, 823 F.2d 4, 5 (2d Cir.1987) that the defendant either has been charged with one of the crimes enumerated in Section 3142(f)(1) or that the defendant presents a risk of flight or obstruction of justice. Once this determination has been made, the court turns to whether any condition or combination of conditions of release will protect the safety of the community and reasonably assure the defendant's appearance at trial. *United States v. Berrios–Berrios*, 791 F.2d 246, 250 (2d Cir.), *cert. dismissed*, 479 U.S. 978, 107 S.Ct. 562, 93 L.Ed.2d 568 (1986).

*United States v. Friedman*, 837 F.2d 48, 49 (2d Cir.1988).

■ During the course of the proffer on behalf of the government, counsel for the government attempted to activate the presumption "that no condition or combination of conditions will reasonably assure the appearance of the [defendants] as required and the safety of the community" pursuant to § 3142(e) of the Bail Reform Act because each defendant was allegedly involved in an offense covered under section 924(c) of Title 18 U.S.C. This argument is based on the government's proffer that each defendant was engaged in training at a terrorist training camp in Afghanistan and instructed in the use of a Kalashnikov rifle and other types of weaponry and that each defendant participated in the use of such weaponry.

Title 18 U.S.C. § 924(c) provides:

(C)(1)(A) Except to the extent that a greater minimum sentence is otherwise provided by this subsection or by any other provision of law, any person who, during and in relation to any crime of violence or drug trafficking crime (including a crime of violence or drug trafficking crime that provides for an enhanced punishment if committed by the use of a deadly or dangerous weapon or device) for which the person may be prosecuted in a court of the United States, uses or carries a firearm, or who, in furtherance of any such crime, possesses a firearm, shall, in addition to the punishment provided for such crime of violence or drug trafficking crime -

\* \* \* \* \* \*

The government argues that since the defendants are charged with a crime of violence, to wit, 18 U.S.C. § 2339B, and since they were "using or carrying firearms" (Kalashnikov rifle and long distance rifles) in furtherance of "providing material support" to a terrorist organization, the aforesaid presumption under § 3142(e) applies.

I find this argument to be without legal merit and therefore reject it for the following reasons. As previously stated, each of the defendants herein is charged in a criminal complaint with having violated 18 U.S.C. §§ 2339B and 2. None of them are charged in any way with having violated 18 U.S.C. § 924(c). The clear holding in *United States v. Chimurenga* disposes of the government's argument:

The plain language of the statute and the legislative history shows that the presumption was intended to arise **only after a defendant has been charged with the particular offense** by a valid complaint or indictment. . . . To hold that the rebuttable presumption comes into play prior to a formal charge would rip the fabric of the statute's carefully sewn procedural safeguards. *See United States v. Payden*, 759 F.2d 202, 205 (2d Cir.1985).

760 F.2d 400, 405 (2d Cir.1985) (emphasis added).

Therefore, it is incumbent upon the government to support its claim that each defendant constitutes a danger to the community by "clear and convincing evidence." *United States v. Rodriguez*, 950 F.2d 85, 88 (2d Cir.1991); *United States v. Martir*, 782 F.2d 1141, 1147 (2d Cir.1986); *Chimurenga*, 760 F.2d at 403; 18 U.S.C. § 3142(f).

█ However, before addressing the issue of what constitutes "clear and convincing evidence" in support of the government's claim, a determination must first be made as to whether Title 18 U.S.C. § 2339B constitutes a crime of violence so as to provide a legal basis for the government's motion to detain any of these defendants. *See* 18 U.S.C. § 3142(f)(1)(A). The defendants argue that 18 U.S.C. § 2339B does not *per se* constitute a crime of violence since "it does not contain an element of physical force, its use, attempted or threatened" and that it does not meet any of the definitions set forth in 18 U.S.C. § 3156(a)(4) subsections A, B and C. Defendants' Joint Memorandum Of Law In Opposition To The Government's Motion For Detention ("Defendants' Joint Memorandum") at p. 7.

> In the task of interpretation of a statute, a court must be disinterested so that it may fairly ascertain Congressional purpose and policy, and must avoid treating the words used in the statute as "empty vessels" into which meaning can be poured.

*Chimurenga*, 760 F.2d at 403.

Title 18 U.S.C. § 3156(a)(4)(B) defines a "crime of violence" as:

> any *other* offense that is a felony and that **by its nature**, involves a **substantial risk** that physical force against the person or property of another **may** be used in the course of committing the offense (emphasis added).

The defendants are charged with having violated 18 U.S.C. § 2339B by "provid[ing] material support or resources to a foreign terrorist organization, or attemp[ing] or conspir[ing] to do so...." Section 2339B(g)(6) defines a "terrorist organization" by reference, to wit, Title 8 U.S.C. § 1182(a)(3)(B)(vi), which defines a "terrorist organization" as follows:

> [T]he term "terrorist organization" means an organization -
>
> . . . . .
>
> (III) that is a group of two or more individuals, whether organized or not, which engages in the activities described in subclause (I), (II) or (III) of clause (iv).

8 U.S.C. § 1182(a)(3)(B)(iii) defines "terrorist activity" in part as follows:

> As used in this chapter, the term "terrorist activity" means any activity which is unlawful under the laws of the place where it is committed (or which, if it had been committed in the United States, would be unlawful under the laws of the United States or any State) and which involves any of the following:
>
> . . . . .
>
> (V) The use of any -
>
> . . . . .
>
> (b) explosive, firearm, or other weapon or dangerous device (other than for mere personal monetary gain),
>
> with intent to endanger, directly **or indirectly**, the safety of one or more individuals or to cause substantial damage to property (emphasis added).

Title 22 U.S.C. § 2656f(d)(2) and (3) define "terrorism" and "terrorist group" as follows:

> (2) the term "terrorism" means premeditated, politically motivated **violence** perpetrated against noncombatant targets by subnational groups or **clandestine** agents; and

(3) the term "terrorist group" means any group practicing, or which has significant subgroups which practice, international terrorism (emphasis added).

In applying the aforesaid definitions and the concepts to which they related, I conclude that 18 U.S.C. § 2339B constitutes a crime of violence.

> It takes little imagination to conclude that providing material support and resources to a terrorist organization creates a substantial risk that the violent aims of the terrorists will be realized. Violence, therefore, is intrinsic to the crimes with which [the defendants are] charged.

*United States v. Lindh*, 212 F.Supp.2d 541, 580 (E.D.Va.2002).

As stated earlier, the defendants are charged with conspiring to violate 18 U.S.C. § 2339B by their alleged actions as a group.

> The existence of a criminal grouping increases the chances that the planned crime will be committed beyond that of a mere possibility. Because the conspiracy itself provides a focal point for collective criminal action, attainment of the conspirators' objectives becomes instead a significant *probability*. Thus, ascribing an ordinary meaning to the words, a conspiracy to commit an act of violence is an act involving a "substantial risk" of violence.

*Chimurenga*, 760 F.2d at 404 (internal citation omitted).

Therefore, I find that the requirement of 18 U.S.C. § 3142(f)(1)(A) has been met.

In order to prevail on its motion for detention of the defendants, the government has the burden of establishing by "clear and convincing evidence" that each defendant constitutes a danger to the community and therefore should not be allowed pretrial release since there are no conditions or combination of conditions that could be imposed to "reasonably assure the appearance of [the defendant] as required and the safety of any other person and the community."

■ However, the government is **not** required to present "a record of violence or dangerous conduct" by each defendant "in order to justify detaining a defendant on grounds of dangerousness." *Rodriguez*, 950 F.2d at 89. Although a prior record of violence eases the government's burden of showing dangerousness, **it is not essential**. The government's burden is "only to prove dangerousness by clear and convincing evidence." *Id.* (emphasis added). *See also LaFontaine*, 210 F.3d at 134; *United States v. Ferranti*, 66 F.3d 540, 543 (2d Cir.1995).

The Bail Reform Act of 1984 requires the Court, in considering whether bail should be granted to a defendant, "to consider properly 'the **nature and seriousness of the danger to … the community** that would be posed by the person's release ….'" *Rodriguez*, 950 F.2d at 89 (emphasis added).

"Clear and convincing evidence" has been defined in a number of different settings, *i.e.*, in cases involving civil litigation as well as in criminal cases. Nevertheless, there appears to be a generally accepted definition which is as follows:

> The clear and convincing standard of proof has been variously defined … as evidence which produces in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established, evidence so clear, direct and weighty and convincing as to enable [the factfinder] to come to a clear conviction, without hesitancy, of the truth of the precise facts in issue.

*Cruzan v. Missouri Dep't of Health*, 497 U.S. 261, 285 n. 11, 110 S.Ct. 2841, 111 L.Ed.2d 224 (1990) (alteration in original) (internal quotation omitted).

In an earlier civil case involving the states of Colorado and New Mexico over water rights, the United States Supreme Court stated that the clear and convincing evidence standard is one which "place[s] in the ultimate factfinder an abiding conviction that the truth of [the proponent's] factual contentions are 'highly probable.'" *Colorado v. New Mexico*, 467 U.S. 310, 316, 104 S.Ct. 2433, 81 L.Ed.2d 247 (1984).

The United States Court of Appeals for the Second Circuit has described

> clear and convincing evidence with respect to a defendant's danger to the community required by § 3142(f)(2)(B) [as being] something more than "preponderance of the evidence," and something less than "beyond a reasonable doubt." To find danger to the community under this standard of proof requires that the evidence support such a conclusion with a high degree of certainty.

*Chimurenga*, 760 F.2d at 405.

Finally, Black's Law Dictionary, Seventh Edition defines "clear and convincing evidence" as follows:

> Evidence indicating that the thing to be proved is highly probable or reasonably certain. This is a greater burden than preponderance of the evidence, the standard applied in most civil trials, but less than evidence beyond a reasonable doubt, the norm for criminal trials.

I point out and emphasize that "[t]he function of a standard of proof is to 'instruct the factfinder concerning the degree of confidence our society thinks he should have in the correctness of factual conclusions for a particular type of adjudication.'" *Addington v. Texas*, 441 U.S. 418, 423, 99 S.Ct. 1804, 60 L.Ed.2d 323 (1979), *quoting In re Winship*, 397 U.S. 358, 370, 90 S.Ct. 1068, 25 L.Ed.2d 368 (1970) (Harlan, J., concurring).

Because of the length of the detention hearing herein, and the voluminous nature of the proof proffered by counsel for the government and each of the defendants, I have prepared an attachment to the Decision and Order, which is incorporated herein by reference, containing a synopsis of the proof proffered by the government in support of its motion to detain the defendants, and the proof proffered on behalf of each defendant in opposition to the motion and in further support of each defendant's application to be released on bail. However, the evidence proffered that I have considered crucial in making my decision is referenced within the body of this Decision and Order.

I find that the government's exhibits proffered at the detention hearing, consisting of airline boarding passes for the defendants Mosed, Taher and Galab, and the passport entries for the defendant Mosed, along with the United States Customs Report for those three defendants, establish in a clear and convincing way that defendants Mosed, Taher and Galab left JFK Airport on April 28, 2001 on Pakistan International Airline's Flight Number 712Y bound for the ultimate destination of Lahore, Pakistan and that they arrived at that destination on April 29, 2001; that they exited Lahore, Pakistan on June 27, 2001 and arrived at JFK Airport on June 27, 2001. I further find that each of these defendants paid the sum of $1,309.20 in cash for their airline tickets for this trip.

As to the defendants Goba, Alwan and Al–Bakri, I find that the statements given by Alwan and Al–Bakri are credible for purposes of this Decision and Order when considered in the context of the total evidence proffered herein. More specifically, the passports of Alwan and Goba offered by the government at the hearing establish that entry visas were issued to them by the Islamic Republic of Pakistan having a duration period of "three months." Alwan's passport indicates an entry at Karachi, Pakistan on May 14, 2001 and a depar-

ture from Karachi, Pakistan on June 20, 2001. The entry date in the Goba passport exhibit is blurred, but it contains an exit stamp from Karachi, Pakistan on August 2, 2001.

In his statement to the F.B.I., Alwan states that Goba "obtained the visas for Al–Bakri and [himself]." T. 394.[2] Al–Bakri in his statement to the F.B.I. states that Goba was "the leader of the group during [the group] trip to Pakistan and Afghanistan" and that Goba was the "emir of the group and collected money from [him] for the trip before they left Lackawanna, New York." T. 394.

Alwan further states that he, Goba and Al–Bakri stayed in Karachi, Pakistan for approximately one week, at which time they met Conspirator A.T. 67. From Karachi, Pakistan, they flew to Quetta, Pakistan where they stayed at the guest house for a period of time. T. 68. From Quetta, they were transported to another guest house in Kandahar, Afghanistan where all three stayed for a week. T. 68–69. While at this guest house, all three received "indoctrination and training by al-Qaida members and other persons affiliated with the al-Qaida terrorist network." T. 69. They were shown, among other things, a movie about the destruction of the USS Cole and how al-Qaida committed that particular terrorist act. There were also conversations about Palestine and Kashmir, and they "were provided with anti-American indoctrination and anti-American sentiments." T. 69.

The defendant Al–Bakri corroborates the substance of the statement given by Alwan to the F.B.I. Al–Bakri, in his statement, has stated that "the leader of the whole trip from Buffalo into the al-Farooq training camp was defendant Goba." T. 104. He admitted having traveled to Kar-

achi, Pakistan along with defendants Goba and Alwan and traveling to Quetta, Pakistan from there. He states that the trip to Quetta was by air and that this trip "was paid for by the people who ran the guest house in Quetta." T. 98. He further "acknowledged driving to Kandahar, going to a guest house there and viewing the movie about the USS Cole." T. 98.

Both Alwan and Al–Bakri have admitted to traveling to a "training camp" some distance from Kandahar, Afghanistan. Alwan called the camp Taseesy, but Al–Bakri states that it was the al-Farooq training camp of al-Qaida. In any event, both of these defendants have stated that while at the training camp, they saw and interacted with the defendants Goba, Mosed, Taher and Galab who were there all at the same time. Al–Bakri further stated that "while in the Kandahar guest house he was given a uniform" which he "wore at the al-Farooq camp on every day but Friday." T. 98. While at this camp, Al–Bakri states that he had contact with the defendants Galab, Taher and Mosed whom he knows as "Shafal." T. 103. Al–Bakri also "indicated that while he was at the al-Farooq training camp, he considered himself to be a member of al-Qaida." T. 103. Both defendants Alwan and Al–Bakri also stated that while all six defendants were at the al-Farooq training camp, Usama bin Laden spoke to the attendees at the camp.

Alwan states that Usama bin Laden gave his speech "on approximately the eighth day of the Taseesy camp" and that bin Laden spoke about an "alliance of the Islamic Jihad and al-Qaida" and that he "mentioned how important it is to train and fight for the cause of Islam." Alwan stated that bin Laden also "espoused anti-

**2.** References are to the Transcript of the Detention Hearing held on September 18, 19 and 20 and October 3, 2002.

American and anti-Israeli statements." T. 91.

Al–Bakri has stated that in the speech given by bin Laden at the al-Farooq camp which he attended along with the other five defendants, bin Laden spoke "about the need to prepare and train" because "there was going to be a fight against Americans." T. 103–104.

Based on the statements of Alwan and Al–Bakri, as well as the aforesaid travel documents, I find that the "training period" at the al-Farooq camp was to be for five weeks and that with the exception of Alwan, all the defendants remained at that camp for the five week period. Al–Bakri has admitted to staying an additional week at the camp. T. 104. He further states that after he did leave the camp, he met up with the defendant Goba in Kandahar. T. 104. He also corroborates Alwan's claim that he, Alwan, left the camp early. Alwan states that he left the training camp "on the tenth day" of his stay there and that he returned to Kandahar and then to Quetta. T. 201.

While at the al-Farooq training camp, all of the defendants were given code names and were given training in the use of explosives. The al-Farooq training camp was "dedicated to producing and training terrorist fighters for the al-Qaida cause." T. 72–74.

The defendant Alwan has also "admitted being lectured by several people at the Kandahar guest house on topics such as jihad and the justification for using suicide as a weapon." T. 95.

One of the documents (Defendant Taher's Exhibit 4) seized from a residence of the defendant Taher pursuant to a search warrant issued by this Court, consists of a lengthy dissertation on the justification of suicide as a form of "martyrdom" under Islam. Counsel for the defendant Taher argues that the document was obtained and retained as an educational reference and consists of nothing more than a comparison of differing theological or philosophical views on the validity of suicide as a means of supporting a cause. Although that may very well be the case, the document contains some disturbing statements. There is an interchange between the words "suicide" and "martyrdom" and self-destruction is valid if done as an act of "martyrdom" and may not be such if it is defined as "suicide." I find the following statements within Defendant Taher's Exhibit 4 to cause serious concern in the context of the issue before this Court:

**Definition of Martyrdom Operations, and their Effect on the Enemy**

Martyrdom or self-sacrifice operations are those performed by one or more people, against enemies far outstripping them in numbers and equipment, with prior knowledge that the operations will almost inevitably lead to death. The form this usually takes nowadays is to wire up one's body, or a vehicle or suitcase with explosives, and then to enter amongst a conglomeration of the enemy, or in their vital facilities, and to demonstrate in an appropriate place there in order to cause the maximum losses in the enemy ranks, taking advantage of the element of surprise and penetration. Naturally, the enacter of the operation will usually be the first to die.

\* \* \* \* \* \*

**Verdicts of Scholars Concerning one who Attacks the Enemy Alone**

Having established the permissibility of plunging into the enemy and attacking alone even when death is certain, we proceed and say that the martyrdom operations are derived from this principle, realizing that the prohibition of suicide relates to deficiency or absence of faith. However, the former generations did not have knowledge of martyrdom operations in their current-day form, for

these evolved with the changes in techniques of warfare, and hence they did not specifically address them. However, they did address similar issues, such as that of attacking the enemy single-handed and frightening them with one's own death being certain. They also deduced general principles under which the martyrdom operations fall, and in doing so they relied on evidence such as those we have mentioned in the previous section. There is one difference between the martyrdom operations and their classical precedent, namely that in our case the person is killed by his own hand, whereas in the other he was killed by the enemy. We also explain that this difference does not affect the verdict.

\*       \*       \*       \*       \*       \*

In fact, we see that this sort of operation was carried out in the presence of the Prophet, and after him by the Sahabah, not once but many times. Furthermore, protection of the religion is the greatest service a Mujahid performs, and the evidences do not leave us with any doubt that a Mujahid may sacrifice his life for the religion. Talhah shielded the Prophet with his hand, and this supports the permissibility of a person sacrificing himself for others in the interests of the religion.

### E.   Synopsis

It has transpired that scholars gave, to the issue of plunging single-handed into the enemy with reasonable certainty of being killed, the same verdict as in cases of death being certain, such that whoever permits the latter permits the former. Further, the majority of scholars gave conditions for the permissibility:

1.  Intention
2.  Infliction of losses on the enemy
3.  Frightening them
4.  Strengthening the hearts of the Muslims.

These statements, if read by impressionable youth, could certainly be said to be inflammatory so as to fire one's passions with intensity of a dithyrambic nature.

■      The finding that all of the defendants traveled to Pakistan and thereafter attended a training camp known as al-Farooq in Afghanistan at which Usama bin Laden spoke espousing anti-American sentiment and received training in the use of weapons and lectures on suicide as a means of causing harm to the enemy, causes the following questions to be asked:

(1)  How did it come to be that six young men, all in their twenties and all being from Lackawanna, New York traveled in two groups between April 28, 2001 and May 12, 2001 to Pakistan?

(2)  Were they recruited by someone to make this trip, and if so, by whom, and on what basis were they selected, and for what purpose?

(3)  How is it that six young men from Lackawanna, New York were allowed entry into Afghanistan since their passports did not indicate that appropriate visas for such entry were issued?

(4)  How is it that six young men from Lackawanna, New York were allowed to enter a secret training camp known as al-Farooq in Afghanistan and attend a speech given by Usama bin Laden?

(5)  What was the objective in attending said training camp and to what use or purpose was such training to be put?

(6)  Why did the defendants Goba, Mosed, Taher, Galab and Al–Bakri remain at the camp for the full training period?

■      Although the government retains the burden of persuasion, a defendant must introduce some evidence contrary to the evidence proffered by the government

in support of its motion to detain. The defendants must come forward with evidence to rebut that of the government. *Chimurenga,* 760 F.2d at 405. *See also Rodriguez,* 950 F.2d at 88; *Martir,* 782 F.2d at 1144.

I find that the defendants in each of their proffers, as well as in the collective proffer made on their behalf, have not come forward with sufficient evidence to offset the government's claims of dangerousness and risk of flight, nor have they presented anything that would constitute reasonable answers to the questions listed above.

As previously stated and reiterated, we cannot abandon the principles established in the United States Constitution when deciding the government's motion to detain. This has not been done, and the defendants, by way of four days of hearing, have received the due process to which they are entitled under the Fifth Amendment as it relates to the issue of bail or detention. However, the United States Constitution does not require that the Court abandon or disregard common sense and the drawing of reasonable inferences based on circumstantial evidence in making its determination.

I have considered each and every one of the factors set forth in 18 U.S.C. § 3142(g), to wit:

(1) the nature and circumstances of the offense charged . . . ;

(2) the weight of the evidence against the person;

(3) the history and characteristics of the person, including

(A) the person's character, physical and mental condition, family ties, employment, financial resources, length of residence in the community, community ties, past conduct, history relating to drug or alcohol abuse, criminal history, and record concerning appearance at court proceedings; and

(B) whether, at the time of the current offense or arrest, the person was on probation, on parole, or on other release pending trial, sentencing, appeal or completion of sentence for an offense under Federal, state or local law; and

(4) the nature and seriousness of the danger to any person or the community that would be posed by the person's release.

The defendants have attacked the validity of the charge placed against each of them on the ground that 18 U.S.C. § 2339B is unconstitutional because of vagueness and in support of their argument, rely on the decision of the United States Court of Appeals for the Ninth Circuit in *Humanitarian Law Project v. Reno,* 205 F.3d 1130 (9th Cir.2000), *cert. denied* 532 U.S. 904, 121 S.Ct. 1226, 149 L.Ed.2d 136 (2001). In response, the government cites the case of *United States v. Lindh,* 212 F.Supp.2d 541 (E.D.Va.2002).

*Humanitarian* is a civil case wherein the plaintiffs sought injunctive relief in the enforcement of § 2339B for fear that their legitimate humanitarian activities would be criminalized by application of the statute. Although the Court of Appeals rejected most of the arguments put forth by the plaintiffs, it did accept the plaintiffs' challenge to the statute on the basis of vagueness, stating:

> It is easy to see how someone could be unsure about what AEDPA prohibits with the use of the term "personnel," as it blurs the line between protected expression and unprotected conduct.

*Humanitarian,* 205 F.3d at 1137.

*Lindh* involved a criminal indictment alleging a violation of 18 U.S.C. § 2339B, and in rejecting the defendant's claim that the statute was unconstitutional, the District Court stated:

Lindh contends his conduct does not, as a matter of law, amount to providing "material support and resources," including "training" and "personnel," because he provided no training and that merely enlisting in. an armed force—rather than recruiting for such a force—does not constitute providing personnel. Lindh is incorrect on both arguments.

\* \* \* \* \* \*

Thus, to provide personnel is to provide people who become affiliated with the organization and work under its direction: the individual or individuals provided could be the provider himself, or others, or both.

*Lindh*, 212 F.Supp.2d at 577.

■ At this stage of the proceeding, and with due respect to the Court of Appeals for the Ninth Circuit, I accept the reasoning of the District Judge in *Lindh* and conclude that one can be found to have "provided material support or resources to a foreign terrorist organization" by offering one's services to said organization and allowing one's self to be indoctrinated and trained as a "resource" in that organization's beliefs and activities. Therefore, for purposes of deciding the government's motion to detain the defendants herein, I reject the contention of unconstitutionality of the statute put forth by the defendants.

As to the defendants Goba, Mosed, Taher, Galab and Al–Bakri, I find that there are no conditions or combination of conditions that I could impose that would reasonably assure the safety of the community and the appearances of the defendants when required. If the defendants are or have become disciples of al-Qaida and believers in self destruction as a legitimate means of causing harm to others, there are no conditions that could be imposed that would deter such act of self destruction other than detention. For purposes of deciding the issue of detention or bail, and only for that limited purpose, I find that

there is sufficient evidence of a clear and convincing nature as to the defendants Goba, Mosed, Taher, Galab and Al–Bakri to consider them a danger to the community and a risk of flight and therefore, as to these defendants, the government's motion to detain is GRANTED.

■ As to defendant Alwan, I find that he has come forward with sufficient evidence to offset the government's claim of dangerousness and risk of flight so as to prevent me, from a legal point of view, from concluding that there are no conditions or combination of conditions that I could impose that would reasonably assure the safety of the community and his appearance when required. To do otherwise would be intellectually dishonest.

I find that the evidence proffered by the government and the defendant Alwan establishes that this defendant apparently disavowed or disclaimed any continued participation in the activities of al-Qaida when he managed to extricate himself from the al-Farooq training camp and return home to Lackawanna, New York on June 20, 2001. He also appears to have voluntarily cooperated with agents of the F.B.I., made disclosures about his own activities as well as those of the other defendants, and made express statements of disagreement with the beliefs of al-Qaida and the use of terrorism against inhabitants of this country. Therefore, the defendant Alwan is hereby released on bail subject to the following terms and conditions:

1. The defendant shall post a bond in the sum of $600,000 or, in the alternative, property free and clear of any liens or encumbrances having a value equal to or greater than $600,000 with the agreement and understanding that such bond or property will be forfeited in the event that any one of the conditions herein is substantially violated as determined by the Court.

2. The defendant shall report to the U.S. Probation Office as directed by the U.S. Probation Officer.

3. Travel is restricted to Erie County unless defendant continues in his employment with his present employer. In that event, the defendant shall be allowed to travel to and from such place of employment by a route pre-approved by the U.S. Probation Office.

4. The defendant shall surrender any passport to the Clerk of the Court or the Federal Bureau of Investigation.

5. The defendant shall obtain no new passport.

6. The defendant shall avoid all contact, direct or indirect, with any potential witness in the subject investigation or co-defendants in this case or related cases unless in the presence of his attorney. Any inadvertent contact must be reported to the U.S. Probation Department within 24 hours.

7. The defendant shall refrain from possessing a firearm, destructive device or other dangerous weapons either directly or indirectly.

8. The defendant shall participate in the following home confinement program and abide by all the requirements of the program which will include electronic monitoring and Global Positioning System. He shall pay all of the costs of the program:

*Home Incarceration:* Defendant is restricted to his residence twenty-four hours per day at all times except for medical needs or treatment, court and meetings with his attorney unless he is employed. If employed, he shall be allowed to leave his residence for the sole purpose of reporting to work. The hours allowed for this purpose shall be determined by the U.S. Probation Office.

9. Global Positioning Satellite Monitoring (GPS): The defendant will be moni-tored by an electric monitoring system which utilizes a Global Positioning Satellite System (GPS) which will monitor the defendant with the use of twenty-four hour satellite. The defendant will pay all costs of the GPS monitoring system.

10. The defendant shall report as soon as possible to the U.S. Probation Office or supervising officer any contact with any law enforcement personnel, including, but not limited to, any arrest, questioning, or traffic stop within 24–hours.

11. The defendant will also be prohibited from possessing or using any cellular phones, public telephones or any other phones, modems, on-line services (including electronic mail), fax machines or pagers.

12. The defendant shall submit to a search of his person, property, vehicle, and place of residence, or any other property under his control, and permit confiscation of any evidence or contraband discovered in accordance with the district-approved search policy.

13. The defendant shall provide the U.S. Probation Office with access to any requested personal and/or business financial information including, but not limited to, authorization to conduct a credit report, or to provide a credit report at the instruction of the U.S. Probation Officer.

14. The defendant shall not possess, purchase, or use a computer or computer equipment, which includes: a modem; Internet account; writable or re-writable CD Rom; tape backup or removable mass storage device; device/appliance that can be used to connect to the Internet; digital camera; Personal Digital Assistant (PDA); and CDs (other than original manufacturer's software distribution). The defendant is prohibited from using any commercial computer systems/services except for employment purposes as approved by the

probation officer. If allowed use of a computer for employment, the system shall only contain software required to perform his job. **The U.S. Probation Office shall install a monitoring application on the defendant's computer or any other system that may be used to connect to the Internet. The U.S. Probation Office shall randomly monitor the defendant's automated systems.**

15. Wire Tap (Telephone Line 1) and Pen Register (Telephone Line 2): The defendant shall have two telephone lines in his residence. One of the telephone lines (line 1) will be subject to recording and monitoring by a company to be approved by the U.S. Attorney's Office and paid for by the defendant. The defendant shall not be permitted to have any access to line one. The second telephone line (line 2) shall be used by the defendant only for attorney calls or to call his pretrial services officer. The conversations on line 2 will not be monitored, however, the U.S. Attorney's Office or a designated law enforcement agency will be permitted to install a Pen Register Device in order to monitor the location of all incoming and outgoing calls occurring on line 2. Any expense incurred will be paid for by the defendant.

No persons other than the defendant, the U.S. Probation Officer and his attorney are permitted to be on line two, nor will the attorneys relay information from third parties unless first approved by the U.S. Attorney's Office.

16. A violation of any condition(s) of your release on bond may result in forfeiture of bail by the United States District Court and cause a bench warrant to be issued.

### CONCLUSION

Based on the foregoing, it is hereby ORDERED that the defendants Goba, Mosed, Taher, Galab and Al–Bakri are detained and are remanded to the custody of the U.S. Marshal Service. It is further

ORDERED that the following DIRECTIONS REGARDING DETENTION be implemented:

1. The defendants are committed to the custody of the Attorney General or his designated representative for confinement in a corrections facility, separate, to the extent practicable, from persons awaiting or serving sentence or being held in custody pending appeal, pending trial of the charges herein against them;

2. The defendants shall be afforded a reasonable opportunity for private consultation with defense counsel; and

3. On order of a court of the United States or on request of an attorney for the government, the person in charge of the corrections facility shall deliver the defendant to the United States Marshal for the purpose of an appearance in connection with a court proceeding.

As to defendant Alwan, it is hereby ORDERED that he be released on bail in accordance with the aforesaid conditions of release but such release shall not occur until the United States Probation Office has completed arrangements for the implementation of the Global Positioning Satellite Monitoring and the electronic monitoring system.

### Attachment

### PROFFER OF PROOF SYNOPSES ATTACHED TO DECISION AND ORDER

### GOVERNMENT'S PROFFER OF EVIDENCE AS TO ALL OF THE DEFENDANTS

The following is a synopsis of the government's general proffer of evidence as to all the defendants:

Executive Order of President Clinton dated 1998, being Executive Order 13099, wherein transactions with terrorists who threatened to disrupt the Middle East peace process was prohibited and naming al-Qaida and Osama bin Laden. T. 49 [1].

In 1999, the F.B.I. places bin Laden on its 10 most wanted list and the United States State Department designated al-Qaida as a terrorist organization and bin Laden as a terrorist. T. 50.

"[Y]ou will see that the government's evidence against the defendants doesn't stop with the training camp activities of the summer of 2001, but in fact continues even beyond the attacks in the World Trade Center, the Pentagon, and the high-lacking of the flight which landed and crashed in Pennsylvania." T. 50.

"[O]ur first statutory basis for detention is that the complaint in this case" charges a crime of violence. T. 55.

The government also references 18 U.S.C. § 3156(a)(4) which also defines the term "crime of violence." T. 56.

The government also relies on the presumption created in 18 U.S.C. § 3142(e) "if this Court is to find probable cause that the defendant committed a violation of 18 U.S.C. § 924(c)" which "prohibits using or carrying a firearm during or in relation to any crime of violence, or possessing a firearm in furtherance of any crime of violence." T. 58.

"[T]hese defendants, in fact, used firearms, rifles and handguns while they were at the al-Farooq training camp." T. 58.

"Mr. Lindh was charged with a violation of 924(c), even though there was no infor-mation that Mr. Lindh possessed a firearm in the United States." T. 60.

"And my point on this, as I read 18 U.S.C. § 3142, the Court could apply the presumption, if it finds probable cause to believe that the person committed the 924(c) offense." T. 61.

The government proffers that the defendants, starting in Lackawanna, divided into two groups in April and May of 2001 in order to travel to the training camp known as al-Farooq. T. 62.

All of the defendants were trained at the camp known as al-Farooq. T. 63.

Group one consisted of Goba, Al–Bakri, Alwan "and a person who had at this point the complaint only calls uncharged co-conspirator B"(sic) . . . [I]n terms of chronology, they [group one] left second. They left during the second week of May 2001. T. 63.

The government's evidence shows that members of group one traveled to Canada, boarded a flight to London, and from there to the United Arab Emirates, and from there went to Karachi, Pakistan. T. 63.

Group two consisted of Taher, Mosed and Galab, and they traveled in late April 2001, April 29, 2001 from New York City to Pakistan. T. 63. They entered Pakistan on April 29, 2001, but they departed on April 28, 2001. T. 64.

Taher, Mosed and Galab paid cash for their airline tickets with a total air fare of $1,309.20 per person.

The government further proffers that when Alwan, Al–Bakri, Goba and uncharged Conspirator B [2] got to the al-Farooq camp, "they saw the defendants Tah-

---

1.  References to "T" are to the transcript of the proceedings held September 18, 19 and 20, and October 4, 2002.

2.  There appears to be either a discrepancy or a misstatement on the part of the government in this assertion in that counsel for the government later states that the defendant Al–Bakri is the person referred to as "uncharged co-conspirator B." T. 92, 95, 97.

er, Mosed and Galab already there". T. 89.

With the exception of the defendant Alwan, "the other defendants charged stayed five to six weeks at the al-Farooq camp". T. 90.

While all of the defendants, including Alwan, were at the al-Farooq camp, Osama bin Laden appeared at the camp and "spoke about topics such as the need to prepare and train, there's going to be a fight against Americans, it's important to fight for the cause of Islam, and espoused anti-American and anti-Israeli sentiments." T. 90, 92.

This speech by bin Laden "occurred fairly early on in the six-week training— five to six week training session. [H]ad the defendants in any event wished to leave, they could have. But, in fact, with the exception of defendant Alwan, [they] remained." T. 92.

"It's the government's position that when the defendants and any person who was going to be trained at al-Farooq, for that matter, arrived at the al-Farooq camp, they were given different names in order to conceal their identify. And that they were known by this code name or different name. And that once they left the camp, they were free to continue on with their given names." T. 96.

Defendants Mosed, Taher and Galab arrived at the al-Farooq training camp earlier than Alwan, Goba and Al–Bakri, and with the exception of Alwan, left the training camp earlier than those other two defendants.

Government's Seized Evidence Submitted in Support of Motion to Detain:

— Alwan's passport
— Al–Bakri's passport—with departure stamp
— Goba's passport—including exit stamp indicating departure
— Mosed passport—with exit stamp.
— Customs Report
— Airlines boarding passes

### Goba

The following is a synopsis of the government's proffer in support of its motion to have the defendant Yahya Goba detained on the basis that he constitutes a danger to the community and is a risk for flight.

The government says he is a member of group one that left for training camp at al-Farooq in May of 2001. T. 63.

The government says he stayed in Karachi, Pakistan along with Alwan and Al–Bakri "for approximately one week, at which time they met Co–Conspirator A. They met uncharged Co–Conspirator A within a few days of arriving in Karachi and were made aware that they were going to meet The Most Wanted," whom the government claims is a reference to bin Laden. T. 67.

The government asserts that he, Alwan and Al–Bakri "knew they were going to Afghanistan to meet Mr. Osama bin Laden when they heard this." T. 67–68.

The government claims he was "physically free to decline to travel to Afghanistan but that he voluntarily, willingly and knowingly embarked on this trip in order to proceed to the al-Farooq training camp". He and Al–Bakri and Alwan "agreed to go to meet Mr. bin Laden" and "they first flew to Quetta, another area within Pakistan and they met (sic) and thereafter went to Kandahar by car." T. 68.

While in Quetta, all three stayed in a guest house which they "were physically free to leave." P. 68. From there, he and Alwan and Al–Bakri went to another guest house in Kandahar where all three stayed for a week. T. 68–69.

At this guest house they began receiving "indoctrination and training by al-Qaida members and other persons affiliated with the al-Qaida terrorist network." "They were shown, among other things, a movie about the destruction of the USS Cole, and how al-Qaida committed that particular terrorist act. There was (sic) also conversations about Palestine and Kashmir." They were "provided with anti-American indoctrination and anti-American sentiments." T. 69.

The government further contends that although all three, Al–Bakri, Goba and Alwan, were free to leave the guest house in Kandahar, they did not do so. However, "once there were twenty people assembled, including Al–Bakri, Goba and Alwan, the [entire] group drove to the al-Farooq training camp" which "was run and maintained by the al-Quida terrorist network and financed by it." T. 69. The government asserts that each defendant, to wit, Al–Bakri, Goba and Alwan was free to leave the camp and return home. T. 70.

The al-Farooq training camp was "dedicated to producing and training terrorist fighters for the al-Qaida cause." T. 72–73.

The government contends that Goba was given a "code name," i.e., a name "different than his own" upon arrival at the camp and that he was "trained on the use of a variety of weapons" including "a Kalashnikov automatic weapon which is capable of firing a great many rounds of ammunition." T. 73.

He was also allegedly "trained in the use of handguns, long-range rifles" and "at least [was] shown and demonstrated the use of C–4, TNT, and other explosives." T. 73–74.

The government further asserts that "at any point during the stay of this defendant at the al-Farooq camp, he was free to leave the camp, and this claim is supported by the fact that the defendant Alwan left the camp 'about ten days into the training' and that Alwan's departure from the al-Farooq camp demonstrates the freedom of movement of the defendants" and "demonstrates that it was [Goba's] conscious decision to remain at the camp and to complete the training and to thereafter be available, as the need may arise, depending on the interests of those that were training them." T. 74–75.

The government asserts that Al–Bakri stated that "the leader of the whole trip from Buffalo into the al-Farooq training camp was defendant Goba". T. 104.

Goba's passport indicates he departed Pakistan on August 2, 2001. T. 105.

The government alleges that he has substantial relatives and contacts residing in the country of Yemen but that he has not had contact with this parents for five months. It is also claimed that he has an "unstable living situation, and has lived in a variety of locations during the year preceding this one, including the Yemen Republic, ... the Bronx, Lackawanna and Yonkers." T. 136. He is unemployed.

### Goba Response

The following is a synopsis of the proffer made on behalf of the defendant Yahya Goba in response to the government's proffer as to why he should be detained and also in support of his application for release on bail during the pendency of this case.

Defendant objects to the government's use of a presumption under the Bail Reform Act, i.e., 18 U.S.C. § 924(c), using or carrying a firearm during and in relation to a crime of violence and cites *United States v. Chimurenga*, 760 F.2d 400 (2d Cir.1985) in support of his position. As a result, the defendant argues that there is no presumption of danger to the communi-

ty upon which the government can rely in support of its motion for detention.

The defendant claims that the "only presumption that attains from the statute is the presumption of release." T. 162.

The defendant cites *United States v. Gebro*, 948 F.2d 1118 (9th Cir.1991) to support his argument that the "weight of the evidence" factor under 18 U.S.C. § 3142(g) "is the lease important factor" in making my decision as to whether the defendant should be detained or not. T. 166.

The defendant asserts that the Criminal Complaint containing the charge of having violated 18 U.S.C. § 2339B and the affidavit upon which it is based fails to establish probable cause or fails "to pass the probable cause standard or test." T. 166–167.

The defendant has made reference to Section 9–91.000 of the U.S. Attorney's Manual "which describes in some detail . . . what exactly is meant by training and what exactly is meant by personnel, in the context of whether or not those rise to the level of material support." T. 168. The U.S. Attorney's Manual says:

> that providing personnel to a designated foreign terrorist organization occurs if and only if that person has knowingly provided the organization with one or more individuals to work under the foreign entity's direction or contact. Individuals who act independently of the designated foreign terrorist organization to advance its goals and objectives, are not working under its direction or control, and may not be prosecuted for providing personnel to a designated foreign terrorist organization. Only individuals who have subordinated themselves to the foreign terrorist organization, i.e., those acting as full-time or part-time employees, or otherwise taking orders

from the entity, are under its direction or control.

T. 168–169.

The defendant argues that there is "nothing in the government's proffer that suggested that Yahya Goba is taking any orders or is subject to the control of al-Quida or any other entity." T. 170.

The defendant claims that the government's proof only consists of allegations that "Yahya Goba was at this alleged terrorist camp, after which he came back to the United States." T. 170. The government has failed to establish that the defendant is in any way taking orders from any terrorist organization, and it is argued the government's proffer "rests entirely on speculation as to what, in fact, a so-called sleeper cell is supposed to mean." T. 170.

The defendant asserts "that after this training camp ends, there is absolutely nothing that the government has proffered that suggests Yahya Goba is taking any orders or control or is subordinate or subservient in any way to the people in the al-Qaida organization." T. 172–173.

"[T]o the extent that the government isolated in its proffer on the two issues of personnel and training, its [the defendant's] position that there's no proof of either providing personnel, and certainly no proof that [the defendant] engaged in any training of any other individual. [T]hose issues go to the weight of the evidence against Mr. Goba." T. 173.

The government has failed to present any evidence establishing "any contact whatsoever from any member of the al-Qaida organization and Yahya Goba". T. 174.

In searching Goba's house, nothing of an incriminating nature was found, "no doctrine, no tapes, no weapons, no artifacts of any sort that would indicate that he was in

any way a member or supportive of this organization." T. 174–175.

No evidence has been presented against Goba in the form of "computer traffic involving [him], no e-mails, no incriminating e-mails, no letters of any sort, no Internet traffic of any sort linking [him] in any way." T. 175. The e-mail entitled "Big Meal," allegedly sent by the co-defendant Al–Bakri, has not been linked in any way to the defendant Goba. T. 175–176.

The same argument applies to the tape cassette recovered from the residence of the co-defendant Al–Bakri which is allegedly entitled "Call to Jihad" in Arabic. T. 179–180.

The defendant further argues that the government has failed to establish that at this point in time or at the time the cassette tape was seized, or the e-mail sent, that the defendant Goba "is still a member of the conspiracy." T. 184. Nothing has been found in Goba's house "that makes him a member of the conspiracy at that time." T. 181.

Neither Alwan nor Al–Bakri implicate Goba as a co-conspirator in the statements they have given to the F.B.I. T. 181.

There has not been a "single proffer [by the government] that any one person in that Yemeni community, any one person says anything about Mr. Yahya Goba being part of the al-Qaida conspiracy, or terrorist organization, or being part of a sleeper cell. Not a single person has been proffered by the government." T. 183.

The factors set forth in 18 U.S.C. § 3142(g)(3) are the strongest for the defendant Goba and "this is where the government's argument is weakest." T. 185. The defendant Goba "was involved in a daily practice of teaching language and religion to people in the community, primarily children, young children, to teenagers." T. 186. The defendant has been described as a "hero" in the "Yemeni community insofar as he has been able to convince a number of young people to involve themselves seriously in the study of Islam, in language studies, to the extent that he is known throughout the community as being one of the most influential members, especially of the children in the community." T. 186.

The defendant asserts that "in terms of [his] history and characteristics, the government can find nothing to point to that would controvert in any way, what I've said. Not at least in terms of the people in this community who know him and can talk about him." T. 187.

The defendant "has strong family ties to this community, not just to the community generally, but he has brothers and sisters who live here. He has lived with his family over the past several years." T. 188.

The defendant asserts that the fact that his parents live in Yemen should not be used against him or that he becomes a flight risk. T. 188.

The defendant has never been arrested and does not use drugs or alcohol. T. 189.

The defendant "denies that he was ever a member of al-Qaida and denies that he is now a member of al-Qaida or has ever been a member of al-Qaida, or has any intention of being a member of al-Qaida." The government has failed to present "proof of memberships by the defendant as [a] member of al-Qaida." T. 339.

The defendant denies that he knew "who it is that operated [the al-Farooq] camp." The government knows "that at the time [the defendant was] allegedly in Afghanistan, that there were a number of factions of civil war going on within Afghanistan." T. 340.

Since the government has a great deal of intelligence information "with respect to activities in Afghanistan, it is obligated to

come forward with information in any way that describes what the camp was for, what its purposes were, who operated it, and how it is that [the defendant] allegedly [was a] participant in it." T. 341.

The defendant also denies that he "took any sort of oath or pledge to become [a] member of al-Qaida" which he asserts is a requirement in order to become a member of al-Qaida. T. 341–342.

The government has failed to indicate how an "al-Qaida sleeper cell" operates or how any other foreign terrorist organization "sleeper cell" operates. The defendant denies being a member of a "sleeper cell terrorist organization." T. 342–352.

The defendant has never "seen the video, seen a transcript of this video, or [has] any knowledge of this particular video" referred to by the government as containing a speech of Osama bin Laden. T. 353.

The defendant also denies "any knowledge of having read what is depicted on this page of the [government's] exhibit" and further denies that he has "ever read the al-Qaida training manual or its introduction, nor [has he] ever had anyone read it to [him] or give [him] instruction with respect to the al-Qaida training manual." T. 353–354.

### Government's Rebuttal to Goba Proffer

The statements of Alwan and Al–Bakri given to the F.B.I. establish that the defendant traveled to Pakistan and went to Afghanistan and attended the al-Farooq training camp. T. 371–372, 376, 377, 378, 382–383.

Al–Bakri described this defendant as "the leader of his group during [the group] trip to Pakistan and Afghanistan" and that Goba was the "emir of the group and collected money from [him] for the trip before they left Lackawanna, New York." T. 394.

Alwan states that Goba "obtained the visas for Al–Bakri and [himself]." T. 394.

Alwan also stated as to this defendant that his "purpose of being in the camp was to receive training." T. 394.

Alwan also reported that "it was Mr. Goba who brought the [defendants], as the emir, as the leader, to Mr. A, the known al-Qaida member and thereafter, the [defendants] went to the al-Farooq training camps." T. 394–395.

The government argues that the defendant has failed to explain his trip because he in fact "went to Afghanistan, to al-Farooq, did not go to Pakistan, and that it is basically uncontested as to what he did and why he went there". T. 395–396.

### *ALWAN*

The following is a synopsis of the government's proffer in support of its motion to have the defendant Sahim Alwan detained on the basis that he constitutes a danger to the community and is a risk for flight.

In his "confession," Alwan described the camp [al-Farooq] by a different name. "But in all respects, the defendant's confession comports with the government's evidence that where all of the defendants were trained, was the camp known as al-Farooq." T. 63.

The government says he was a member of group one that left for the al-Farooq training camp in May 2001. T. 63.

The government says that he and Goba and Al–Bakri "stayed in Karachi, Pakistan for approximately one week, at which time they met Conspirator A." They met uncharged Co–Conspirator A within a few days of arriving in Karachi and were made aware that they were going to meet "The Most Wanted" whom the government claims is the reference for bin Laden. T. 67.

The government claims that its "evidence will show that *all* the defendants, when they heard this, knew that they were going to Afghanistan to meet Mr. Osama bin Laden," "and at least with respect to Mr. Al–Bakri, he knew that making this trip was wrong." T. 67–68.

The government claims that he was physically free to decline to travel to Afghanistan but that he voluntarily, willingly and knowingly embarked on this trip in order to proceed to the al-Farooq training camp. He and Goba and Al–Bakri "agreed to go to meet Mr. bin Laden" and "they first flew to Quetta, another area within Pakistan and they met (sic) and thereafter went to Kandahar by car." T. 68.

While in Quetta, "all three stayed in a guest house which they were physically free to leave." T. 68. From there, he and Goba and Al–Bakri went to another guest house in Kandahar where all three stayed for a week. T. 68–69.

At this guest house they began receiving "indoctrination and training by al-Qaida members and other persons affiliated with the al-Qaida terrorist network." "They were shown, among other things, a movie about the destruction of the USS Cole, and how al-Qaida committed that particular terrorist act. There was (sic) also conversations about Palestine and Kashmir." They were "provided with anti-American indoctrination and anti-American sentiments." T. 69.

The government further contends that although all three, Al–Bakri, Goba and Alwan, were free to leave the guest house in Kandahar, they did not do so. However, "once there were twenty people assembled, including Al–Bakri, Goba and Alwan, the [entire] group drove to the al-Farooq training camp" which "was run and maintained by the al-Quida terrorist network and financed by it." T. 69. The government asserts that each defendant, to wit, Al–Bakri, Goba and Alwan was free to leave the camp and return home. T. 70.

The al-Farooq training camp was "dedicated to producing and training terrorist fighters for the al-Qaida cause." T. 72–73.

The government alleges that Alwan was given a "code name", *i.e.*, a name "different than [his] own" at the camp. T. 73.

The government further asserts that "at any point during the stay" of this defendant at the al-Farooq camp, he was free to leave the camp, and this claim is supported by the fact that the defendant Alwan left the camp "about ten days into the training" and that Alwan's departure from the al-Farooq camp "demonstrates the freedom of movement of the defendants" and "demonstrates that it was [Goba's and Al–Bakri's] conscious decision to remain at the camp and to complete the training and to thereafter be available, as the need may arise, depending on the interests of those that were training them." T. 74–75.

Also as to the defendant Alwan, the government admits that he left the al-Farooq training camp [3] after "about ten days into the training" and that "the government's evidence at this point only shows that he received training on the Kalashnikov rifle" and that he "did not receive training in the handgun or in the rifle, or in the explosives for that matter." T. 74, 88–90.

According to the government, Alwan admitted to F.B.I. agents that "on approximately the eighth day of the Taseesy camp, that [he] attended a speech given by

3. The defendant Alwan states that the name of the camp that he was taken to was known as "the Taseesy camp." *See* Government Exhibit entitled "Alwan Confession." The government asserts that the "Taseesy camp" is "identical to the al-farooq camp". T. 91.

Osama bin Laden concerning the alliance of the Islamic Jihad and al-Qaida". He [bin Laden] also mentioned how important it is to train and fight for the cause of Islam and "espoused anti-American and anti-Israeli statements." T. 91.

The government argues that notwithstanding that Alwan left the training camp shortly after the bin Laden speech, the fact that this defendant did not leave after "the speech in the Kandahar guest house in which suicide was first broached as use of a weapon" should cause the Court to conclude that defendant Alwan constitutes a danger to the community or a risk of flight. T. 93. The government further argues that since the defendant Alwan did not make disclosures to the government about his trip, especially in light of the tragic events of September 11, 2001, this silence militates against him. T. 94.

The government also asserts that Alwan "admitted being lectured by several people at the Kandahar guest house on topics such as Jihad and the justification for using suicide as a weapon." T. 95. He also allegedly admitted "receiving a different name at this guest house and having been trained in Kalashnikov (sic)." T. 95.

Alwan and uncharged Conspirator B "took a bus to the al-Farooq camp along with a number of other men" and at the camp, he "saw defendants Goba, Al–Bakri, Mosed, Galab and Taher also at the camp" and "had interaction with [them] there." T. 95.

The government contends that Alwan admitted that "he was aware that he would be going to the al-Farooq camp, approximately the time he arrived in Karachi." T. 96.

The defendant Al–Bakri advised the government that Alwan had "left the [training] camp approximately a week or two into training." T. 103.

Alwan's passport and the exit stamp establish that he left Pakistan on June 20, 2001. T. 106.

### Alwan Response

The following is a synopsis of the proffer made on behalf of the defendant Sahim Alwan in response to the government's proffer as to why he should be detained and also in support of his application for release on bail during the pendency of this case.

The defendant joins in the argument made by the defendant Goba that the government cannot rely on the presumption provided in 18 U.S.C. § 3142(e) based on an alleged but uncharged offense under 18 U.S.C. § 924(c).

The defendant asserts that 18 U.S.C. § 2339B is unconstitutional because of its "vagueness." T. 193.

The defendant also denies the existence of a conspiracy as charged by the government. "The fact that some people may travel together or go someplace together, even if it were a place that we did not like, and even if it was a place you shouldn't have gone to, does not necessarily mean that that is a criminal conspiracy." The government has not demonstrated "what the agreement was that is alleged by the government." T. 194.

"The only source of any information that [the government] proffered were (sic) alleged statements made by [Alwan] and alleged statements made by Mr. Al–Bakri." T. 195.

The government has failed to produce any evidence connecting the defendant Alwan and the other defendants with Osama bin Laden. T. 196.

The government has failed to identify a "source" for the statement that the defendants "were going to meet The Most Wanted" and has also failed to establish that the title "The Most Wanted" is in fact

a reference to Osama bin Laden. The government's assertion is merely an assumption. T. 196.

The government has failed to identify a "source" for its assertions regarding the "guest house" and the conducting of "lectures at the guest house" and has failed to establish "what it is that was said in the guest house, whom it is that was there when it was said, what was the context in which it was said, what was the meaning of what it was that was said in the guest house." T. 196–197. The government "is asking the Court to fill in the blanks and that's not the Court's role." T. 197.

The defendant contests the government's characterization of the defendants' "free[dom] to leave all along the way, free[dom] to leave in Pakistan, free[dom] to leave in Quetta, free[dom] to leave in Karachi, free[dom] to leave the camp any time they wanted," and such characterization "is a conclusion, it is not a statement of fact." T. 197–198.

The government has not described the location of "this camp other than the fact that it was either maybe an hour or maybe three hours from Kandahar," nor did the government describe "what the area was like." T. 198.

The defendant proffers that he and his companions "were driven to the camp, there was no egress from the camp without permission, that the camp was guarded, that [the defendant] was under guard when [he] was there and that [he was] not free to leave, and that the camp was out in the wilderness." T. 198. The defendant further asserts that "even if [he] left the camp, [he] wouldn't know where [he was] and [he] wouldn't know how to get to Kandahar or any place else." T. 198.

The defendant disputes the implications put forth by the government as to the type of "training" he allegedly received at the camp. He asserts that "right after he got there, [he] started to learn how to use and disassemble and maintain a Kalashnikov rifle as part of the first phase of [his] training. During [his] training [he] would aim and pull the trigger of the Kalashnikov, but never fired any real bullets. The actual shooting of the Kalashnikov rifle was going to be part of the next phase of training." T. 199–200.

The defendant asserts that on the fifth day of his stay at the camp, he saw another person and told him that he wanted to leave because he was scared and missed his family. This person tried to convince him to finish the training and he told that person that he didn't agree with the mentality of the people at the camp. His purpose for attending the camp was "to see what it was all about" and "[a]fter realizing the crazy radical mentality of the people at the camp, [he] decided to leave." T. 200. "[O]n the sixth day at the camp after talking to another person, [he] asked another person if [he] could leave the camp" but was "told that [he] could not leave" and that he should "go back and finish the training. [He] pleaded with him to let [him] go" because he "wanted to see [his] family." T. 200–201.

The defendant claims that he "cried when [he] asked" to be allowed to leave the camp and that he "could not sleep at night." He "even faked an ankle injury in order to be allowed to leave." T. 201.

"On approximately the eighth day at the Taseesy camp, [he] attended a speech given by Osama bin Laden concerning the alliance of Islamic Jihad and al-Qaida" and "how important it is to train and fight for the cause of Islam." Osama bin Laden "also espoused anti-American and anti-Israeli statements." T. 201.

"On the tenth day of the camp another person allowed [him] to leave" and he "took a ride in a pickup truck to the City

of Kandahar" where he "had to stay in a guest house for two days before taking a ride in a minivan to Quetta." T. 201.

The defendant further asserts that the "original plan for [his] trip to Pakistan was to attend Tablighi Jamaat in Karachi. [He] did not realize that [they] were going to training camp until [he] arrived in Karachi." T. 201.

The defendant denies "hear[ing] about any specific threats while at the camp" and states that he is "not aware of any current or past threats to the United States or any other country." T. 202.

The defendant also objects to the government's characterization of his "statement" by labeling it a "confession" in the government's exhibit packet. The defendant asserts that he has not confessed to anything and that his "statement" is not a "confession to committing any crime." T. 203. However, the defendant does admit that he was present in a camp at which bin Laden appeared and spoke. T. 203. The defendant also concedes that he departed from Pakistan on June 20, 2001 but states that he voluntarily surrendered his passport to the F.B.I. agents on September 12, 2002 before he was arrested. The defendant also consented to the search of his home. T. 204–205.

In support of his request for release on bail, the defendant advises that he is a United States citizen by birth and has lived his entire life in the United States "other than five years when he was a teenager when he lived in Yemen" after his father retired from Bethlehem Steel and moved the entire family there. T. 206.

He completed high school in the United States and obtained an associate's degree from Erie County Community College and on September 7, 2002 he went to Empire State College where he signed up for an indoctrination program and obtained an application for admission in order to get his bachelor's degree. T. 206–207.

The defendant's mother and father live in Lackawanna. The defendant is married, has three children and lives with his wife. T. 207. The defendant "has been extremely active in his religion and in his mosque and was president of the mosque for a year." T. 208. "He is extremely well respected in the community" and has been "employed at the Iroquois Job Corps Center, where he was a counselor to young men and women who were placed in the Job Corps." T. 207–208.

The defendant asserts that "he has not only never said anything anti-American; to the contrary, in one of the videos that was displayed on the news, shows him praising the United States, not attacking it in any way." T. 209.

The defendant has never been convicted of a crime and has been of assistance to the F.B.I. when he worked as a security guard at the Blue Cross and Blue Shield Building. T. 213–214.

The defendant has voluntarily returned phone calls to F.B.I. Special Agent Needham when requested to do so. The defendant did not attempt to flee when he had been advised on September 13, 2002 that he was going to be arrested. T. 210–211.

The defendant also points out that before he went to Saudi Arabia for a pilgrimage to Mecca in February 2002, he advised Special Agent Needham that he was going to make such a trip and also advised him of the date that he would be returning and that he did return on that date. T. 213.

The defendant "denies that he was ever a member of al-Qaida and denies that he is now a member of al-Qaida or has ever been a member of al-Qaida, or has any intention of being a member of al-Qaida." T. 339. The government has failed to present "proof of memberships by the de-

fendant as [a] member of al-Qaida." T. 339.

The defendant denies that he knew "who it is that operated [the al-Farooq] camp." T. 340. The government knows "that at the time [the defendant was] allegedly in Afghanistan, that there were a number of factions of civil war going on within Afghanistan." T. 340.

Since the government has a great deal of intelligence information "with respect to activities in Afghanistan, it is obligated to come forward with information in any way that describes what the camp was for, what its purposes were, who operated it, and how it is that [the defendant] allegedly [was a] participant in it." T. 341.

The defendant also denies that he "took any sort of oath or pledge to become [a] member of al-Qaida" which he asserts is a requirement in order to become a member of al-Qaida. T. 341–342.

The government has failed to indicate how an "al-Qaida sleeper cell" operates or how any other foreign terrorist organization "sleeper cell" operates. The defendant denies being a member of a "sleeper cell terrorist organization." T. 342–352.

The defendant has never "seen the video, seen a transcript of this video, or [has] any knowledge of this particular video" referred to by the government as containing a speech of Osama bin Laden. T. 353.

The government also denies "any knowledge of having read what is depicted on this page of the [government's] exhibit" and further denies that he has "ever read the al-Qaida training manual or its introduction, nor [has he] ever had anyone read it to [him] or give [him] instruction with respect to the al-Qaida training manual." T. 353–354.

### Government's Rebuttal to Alwan Proffer

Alwan, through his lawyer, admits he was in Afghanistan and that he was at the al-Farooq training camp. T. 367, 377.

The defendant gave a statement to the F.B.I. on September 12, 2002, the contents of which has not been denied by the defendant. T. 367.

The defendant describes what was taught at the training camp, to wit, "jihad and that suicide bombers are martyrs." T. 378.

Alwan also stated to this defendant that his "purpose of being in the camp was to receive training." T. 394.

The government asserts that the failure of the defendant to report what went on in Pakistan and Afghanistan, *i.e.*, the guest house lectures and the training camp events, is indicative of the secret nature of the defendant's activities and his non-disavowal of Osama bin Laden and the principles of al-Qaida thereby causing him to be a continuing danger to the community. T. 384–386. There was a "conspiracy of silence" among all of the defendants. T. 390.

Alwan heard lectures "by several people regarding jihad, prayers and justification for using suicide as a weapon" and "used a different name than his own throughout his stay at the guest house". T. 398.

### MOSED

The following is a synopsis of the government's proffer in support of its motion to have the defendant Shafal Mosed detained on the basis that he constitutes a danger to the community and is a risk for flight.

The government says he was a member of group two who traveled from New York City to Karachi, Pakistan in April 2001. T. 63. He entered Pakistan on April 29,

2001 after departing the United States on April 28, 2001. T. 64. He paid $1,309.20 in cash for his airline ticket. T. 64.

"In addition to receiving the training in the Kalashnikov, the long rifle and the handgun," Mosed, along with Taher and Galab "received training in mountain climbing." T. 89.

The government asserts that Alwan advised that he saw Mosed along with Galab and Taher at the al-Farooq camp and that those defendants had been at the camp for three to four weeks before his arrival. T. 95.

Mosed, along with Taher and Galab, arrived at the al-farooq training camp earlier than the defendants Alwan, Goba and Al–Bakri, and with the exception of Alwan, left the camp earlier than the other two defendants. T. 106–107.

Mosed's passport with an exit stamp shows that he left Pakistan on June 27, 2001. T. 107.

The government produced airline ticket receipts for him indicating a departure from JFK Airport on April 28, 2001 on Flight 712Y on Pakistan International Airline.

The government produced a United States Customs report that indicates that Mosed returned to JFK Airport on June 27, 2001. T. 108.

Notwithstanding that Mosed claimed a total net worth $1,000 to Pretrial Services and the Court, $6,400 was recovered from a coat located in Mosed's house. T. 119–120.

The government also alleges that Mosed "spent a total of $89,000 at Casino Niagara," which indicates that he has "access to substantial amounts of undeclared cash." T. 120.

### Mosed Response

The following is a synopsis of the proffer made on behalf of the defendant Shafal Mosed in response to the government's proffer as to why he should be detained and also in support of his application for release on bail during the pendency of this case.

The defendant joins in the legal arguments put forth on behalf of the co-defendants Goba and Alwan that the government cannot rely on the presumption provided in 18 U.S.C. § 3142(e) based on an alleged but uncharged offense under 18 U.S.C. § 924(c). The defendant also asserts that there is no probable cause to support the charge of having violated 18 U.S.C. § 2339B placed against him. T. 218.

The defendant is a citizen of the United States by birth, age 29, married and a father of a two-year old son and lives in Lackawanna, New York with his wife and son. T. 218–219. He also takes care of his disabled mother. T. 219.

The defendant asserts that he is "proud of being an American" and that he does not "buy into that other stuff." T. 221. He is presently enrolled in Erie County Community College and was employed at the time of his arrest on the present charge. T. 221.

In July of 2001, the defendant was contacted by the F.B.I. "and asked if he'd come in and talk, and he said sure and he went in and he spoke and they had a meeting. He's an American citizen [and] he's trying to be cooperative." T. 225.

In rejecting the government's implication that the defendant had $6,400 when he was arrested, the defendant states that the money belonged to his wife which she received from her mother and the defendant was not aware of this. T. 226.

As to the government's claim that he has spent a total of $89,000 at Casino Niagara, the defendant proffers that he never spent $89,000 at the casino. He points out that the government has not given a "time frame" as to when this $89,000 was spent. The defendant asserts that he has not been to Casino Niagara "in about four years." He further proffers that he had been given a Casino Niagara card which would entitle the user of the card to acquire "points" depending on the amount of money spent, which points could be redeemed for hotel stays and dinners. It was a common practice to pass such a card around among friends who were going to the casino and have them also build up points on the card. The defendant also asserts that the currency amounts in question would be in Canadian funds. T. 227–228.

The defendant denies having had any tapes or literature pertaining to bin Laden or al-Qaida and nothing of that nature was seized from the defendant pursuant to search warrants. The defendant also denies being involved in e-mail transmissions espousing "any views that are compatible with those of Osama bin Laden or al-Qaida." T. 228–229.

The defendant contends that the government has failed in presenting any proof to establish the existence of a "sleeper cell" or that he is a member of "sleeper cell." The defendant has not done anything of an illegal nature since his trip to Pakistan in 2001, which he has admitted making. However, the defendant argues that the government has not submitted any proof establishing that he traveled to Afghanistan. When he traveled to Pakistan, he did so under his own name with a valid passport and not by a circuitous route. Nor has any proof been submitted to establish that he went to any "guest house." Neither Al–Bakri's statement nor Special Agent Needham's affidavit in support of the Criminal Complaint establish that the defendant Mosed was at the al-Farooq training camp. T. 230–233. The only source for the government's accusation that the defendant Mosed was at the al-Farooq training camp is the co-defendant Alwan who claims he saw Mosed there. The defendant questions the reliability of Alwan's claims. T. 233–235.

The defendant is merely "a guy from Lackawanna, sports nut, who is religious, goes to the mosque, has the opportunity last year to go to Pakistan, goes to Pakistan." T. 235. This, he asserts, does not constitute sufficient proof to have him detained. T. 235–236.

The defendant was able to borrow money from friends in order to purchase his airline ticket for the trip to Pakistan and back, and he paid that money back out of an income tax refund that he had coming. T. 236.

The defendant "denies that he was ever a member of al-Qaida and denies that he is now a member of al-Qaida or has ever been a member of al-Qaida, or has any intention of being a member of al-Qaida." T. 339. The government has failed to present "proof of memberships by the defendant as [a] member of al-Qaida." T. 339.

The defendant denies that he knew "who it is that operated [the al-Farooq] camp." T. 340. The government knows "that at the time [the defendant was] allegedly in Afghanistan, that there were a number of factions of civil war going on within Afghanistan." T. 340.

Since the government has a great deal of intelligence information "with respect to activities in Afghanistan, it is obligated to come forward with information in any way that describes what the camp was for, what its purposes were, who operated it,

and how it is that [the defendant] allegedly [was a] participant in it." T. 341.

The defendant also denies that he "took any sort of oath or pledge to become [a] member of al-Qaida" which he asserts is a requirement in order to become a member of al-Qaida. T. 341–342.

The government has failed to indicate how an "al-Qaida sleeper cell" operates or how any other foreign terrorist organization "sleeper cell" operates. The defendant denies being a member of a "sleeper cell terrorist organization." T. 342–352.

The defendant has never "seen the video, seen a transcript of this video, or [has] any knowledge of this particular video" referred to by the government as containing a speech of Osama bin Laden. T. 353.

The government also denies "any knowledge of having read what is depicted on this page of the [government's] exhibit" and further denies that he has "ever read the al-Qaida training manual or its introduction, nor [has he] ever had anyone read it to [him] or give [him] instruction with respect to the al-Qaida training manual." T. 353–354.

### Government's Rebuttal to Mosed Proffer

He admits through his lawyer that he traveled overseas and was in Pakistan. T. 371.

The statements of Alwan and Al–Bakri given to the F.B.I. establish that the defendant went to Afghanistan and was in the al-Farooq training camp. T. 371–372, 376, 377, 378, 382–383.

The defendant, through his lawyer, concedes that he "traveled to Pakistan." T. 339. The defendant admitted in his interview with the F.B.I. on July 8, 2002 that "he traveled to Pakistan with Mr. Taher and Mr. Galab" which admission confirms "what Mr. Al–Bakri and Mr. Alwan said to the F.B.I. eventually in September in their statements," to wit, "that this group of people was together when they traveled to the al-Farooq camp." T. 399–400.

The defendant indicated that he and two others, Taher and Galab, "traveled to Pakistan," but he has participated in a "conspiracy of silence" by denying he traveled to Afghanistan or was at the al-Farooq camp. T. 399–400.

Alwan also stated that this defendant's "purpose of being in the camp was to receive training." T. 394.

The government asserts that the failure of the defendant to report what went on in Pakistan and Afghanistan, i.e., the guest house lectures and the training camp events, is indicative of the secret nature of the defendant's activities and his non-disavowal of Osama bin Laden and the principles of al-Qaida thereby causing him to be a continuing danger to the community. T. 384–386. There was a "conspiracy of silence" among all of the defendants. T. 390.

### TAHER

The following is a synopsis of the government's proffer in support of its motion to have the defendant Yasein Taher detained on the basis that he constitutes a danger to the community and is a risk for flight.

The government says he was a member of group two who traveled from New York City to Karachi, Pakistan in April 2001. T. 63. He entered Pakistan on April 29, 2001 after departing the United States on April 28, 2001. T. 64. He paid $1,309.20 in cash for his airline ticket. T. 64.

"In addition to receiving training in the Kalashnikov, the long rifle and the handgun," he, along with Mosed and Galab, "received training in mountain climbing." T. 89.

The government asserts that Alwan advised that he saw Taher along with Mosed

and Galab at the al-Farooq camp and that those defendants had been at the camp three to four weeks before he arrived. T. 95.

Taher, along with Mosed and Galab arrived at the al-Farooq training camp earlier than the defendants Alwan, Al–Bakri and Goba, and with the exception of Alwan, left the camp earlier than the other two defendants. T. 106–107.

The government produced his airline boarding pass which indicates a departure from JFK Airport on April 28, 2001 on Flight 712Y on Pakistan International Airline. T. 107–108.

The government produced a United States Customs report that indicates that Taher returned to JFK Airport on June 27, 2001. T. 108.

The government alleges that Taher is a visitor to Casino Niagara, and on February 16, 2002, he was refused entry into Canada "due to conflicting information on his ultimate destination." T. 125. At the time, he had $1,300 cash on him. T. 125. It is also claimed that he made "four currency transactions, and exchanged $15,700 United States currency and received $24,178 Canadian currency". T. 125.

### Taher Response

The following is a synopsis of the proffer made on behalf of the defendant Yasein Taher in response to the government's proffer as to why he should be detained and also in support of his application for release on bail during the pendency of this case.

The defendant attacks the weight of the government's evidence submitted in support of its motion to detain the defendant and upon which the criminal charge against the defendant is based. He asserts that the alleged statements given by the co-defendants Alwan and Al–Bakri implicating him should be deemed unreliable in accordance with established case law, citing *Lee v. Illinois*, 476 U.S. 530, 106 S.Ct. 2056, 90 L.Ed.2d 514 (1986). T. 238–240. "The only evidence that even places him in Afghanistan, comes from these statements by two of the co-defendants." T. 242.

The only evidence presented by the government to establish that the defendant was in Afghanistan comes from the alleged statements made by the co-defendant Alwan to Special Agent Needham as set forth in Needham's affidavit sworn to September 13, 2002 where it is alleged that Alwan, "upon arrival at the camp [in Afghanistan] saw ... Yasein Taher" and that "Taher advised that [he] had been in training for 3–4 weeks, receiving instruction on firearms and mountain climbing." T. 242–248; Needham Affidavit, ¶ 24.

In traveling to Pakistan, the defendant used his own name and he proffers that since he had been working, he had the funds to pay for his airline ticket. The fact that he paid for it in cash is of no consequence because it is common in the culture that the defendant comes from to transact business in cash. T. 248–249.

The defendant asserts that the government's claim of his attendance at the camp during the time period that Osama bin Laden spoke as alleged by the co-defendant Alwan in his statement to Special Agent Needham, does not coincide, from a time perspective, with the government's other claims as to the length of the training camp and when the defendant allegedly began training at the camp and the duration of his alleged training period. As a result, he argues that the statements of Alwan, as they relate to him, are unreliable and must be disregarded. T. 250–252.

The defendant further asserts that the government has not claimed in its proffer that he ever "was part of that group that went to the guest house in Kandahar, so

212

that [he] never would have been exposed to whatever took place there, if indeed anything took place there." T. 252–253.

The defendant "under the government's evidence, is not linked to any communications, e-mail or otherwise." T. 253. He "voluntarily gave a statement to the F.B.I. on July 26, 2002 after he contacted the F.B.I. by returning a call to Special Agent Needham and arranged the interview". T. 253.

"In no sense is he linked to the recovery of any types of weapons or firearms. The most that [the government has] on that subject is the singular statement given by Mr. Alwan to the authorities in which it is reported that supposedly Mr. Taher had told him that he had received some firearms training when he was allegedly in Afghanistan." T. 253–254.

"There is no allegation of any type of improper conduct related to this scheme by Mr. Taher, since his return from Pakistan on June 27, 2001." T. 254.

Even if the Court were to find that the defendant had gone to Afghanistan, "there's a significant question as to whether or not that presence would violate the statute under which [he] is charged." T. 255.

If the co-defendant Alwan's statements about Taher are accepted, "it's clear that Mr. Taher, left early. He didn't complete this camp . . . the numbers do not work out." T. 272.

The government has not seized any evidence that links the defendant to any wrongdoing and there has been "no subsequent conduct on his part that the government complains about." T. 272.

The defendant is 24, lives with his mother in Lackawanna and is a citizen of the United States and has lived in Lackawanna his entire life. He is religiously married in the Muslim faith to Nicole Frick, and they have a three-year old son. He has no prior criminal convictions. T. 275–278.

As to the alleged money transactions on October 10, 2001 and February 18, 2002 at Casino Niagara, the defendant was not involved in these transactions. They were carried out by the defendant's brother, Mohammed Taher, who had taken and used the defendant's identification records. T. 279–280, 283.

The defendant "denies that he was ever a member of al-Qaida and denies that he is now a member of al-Qaida or has ever been a member of al-Qaida, or has any intention of being a member of al-Qaida." T. 339. The government has failed to present "proof of memberships by the defendant as [a] member of al-Qaida." T. 339.

The defendant denies that he knew "who it is that operated [the al-Farooq] camp." T. 340. The government knows "that at the time [the defendant was] allegedly in Afghanistan, that there were a number of factions of civil war going on within Afghanistan." T. 340.

Since the government has a great deal of intelligence information "with respect to activities in Afghanistan, it is obligated to come forward with information in any way that describes what the camp was for, what its purposes were, who operated it, and how it is that [the defendant] allegedly [was a] participant in it." T. 341.

The defendant also denies that he "took any sort of oath or pledge to become [a] member of al-Qaida" which he asserts is a requirement in order to become a member of al-Qaida. T. 341–342.

The government has failed to indicate how an "al-Qaida sleeper cell" operates or how any other foreign terrorist organization "sleeper cell" operates. The defen-

dant denies being a member of a "sleeper cell terrorist organization." T. 342–352.

The defendant has never "seen the video, seen a transcript of this video, or [has] any knowledge of this particular video" referred to by the government as containing a speech of Osama bin Laden. T. 353.

The government also denies "any knowledge of having read what is depicted on this page of the [government's] exhibit" and further denies that he has "ever read the al-Qaida training manual or its introduction, nor [has he] ever had anyone read it to [him] or give [him] instruction with respect to the al-Qaida training manual." T. 353–354.

### Government's Rebuttal to Taher Proffer

He admits through his lawyer that he traveled overseas and was in Pakistan. T. 371.

The statements given by Alwan and Al–Bakri to the F.B.I. establish that he went to Afghanistan and was present at the al-Farooq training camp. T. 371–72, 376, 377, 378, 382–383.

The defendant admitted that he traveled to Pakistan with Galab and Mosed "for about two months." T. 409. However, other than a hotel in Lahore, Pakistan, the defendant has not been able to recall "the name of one mosque he visited in Lahore" or "the names of any other hotel, mosque, landmark, restaurant, description of a hotel room or hotel lobby beyond his second week in Pakistan." T. 409. The government argues that this is so because he spent his time in Afghanistan and not Pakistan and that "he was trying to affirmatively mislead the investigating F.B.I. agents" when giving his statement to them on July 26, 2002. T. 408–409.

Alwan also stated as to this defendant, that his "purpose of being in the camp was to receive training." T. 394.

The government asserts that the failure of the defendant to report what went on in Pakistan and Afghanistan, i.e., the guest house lectures and the training camp events, is indicative of the secret nature of the defendant's activities and his non-disavowal of Osama bin Laden and the principles of al-Qaida thereby causing him to be a continuing danger to the community. T. 384–386. There was a "conspiracy of silence" among all of the defendants. T. 390.

### GALAB

The following is a synopsis of the government's proffer in support of its motion to have the defendant Faysal Galab detained on the basis that he constitutes a danger to the community and is a risk for flight.

The government says he was a member of group two who traveled from New York City to Karachi, Pakistan in late April 2001. T. 63. He entered Pakistan on April 29, 2001 after departing the United States on April 28, 2001. T. 64. He paid $1,309.20 in cash for his airline ticket. T. 64.

"In addition to receiving the training in the Kalashnikov, the long rifle and the handgun," he, along with Mosed and Taher, "received training in mountain climbing." T. 89.

The government asserts that Alwan advised that he saw Galab along with Mosed and Taher at the al-Farooq camp when he, Alwan arrived there and that those defendants had been at the camp for three to four weeks before his arrival. T. 95.

Galab, along with Mosed and Taher, "arrived at the al-Farooq training camp earlier" than the defendants Alwan, Al–Bakri and Goba, and with the exception of the defendant Alwan, left the camp earlier than the other two defendants. T. 106–107.

The government produced an airline boarding pass for him which indicates a departure from JFK Airport on April 28, 2001 on Flight 712Y on Pakistan International Airline. T. 107–108.

The government produced a United States Customs report indicating that Galab returned to JFK Airport on June 27, 2001. T. 108.

### Galab Response

The following is a synopsis of the proffer made on behalf of the defendant Faysal Galab in response to the government's proffer as to why he should be detained and also in support of his application for release on bail during the pendency of this case.

The defendant is willing to have his residence electronically monitored by cameras as well as submitting to an electronic monitoring system of his person. T. 297–298.

The defendant is 26, he was born in Buffalo, New York and is a citizen of the United States. He is married, has two children with a third on the way. He owns his own home and has strong family ties in the community. With the exception of four years in Yemen, he has lived his entire life in the United States and "is a loyal American who loves his country." T. 301. He has been employed for "the most part in his adult life" and is presently self-employed operating a gas station. T. 300–302.

Since he has been employed, he had the funds to purchase his airline ticket to Pakistan and therefore, there should be no inference of criminality applied to that purchase. T. 302.

The defendant also joins in the position put forth by the defendants Goba, Alwan, Mosed and Taher as to the weight to be given to the government's evidence and the legal invalidity of the charge. T. 303–304.

He also joins in the legal argument put forth by the defendant Taher as to the unreliability of the alleged statements of the co-defendants Alwan and Al–Bakri. T. 304.

The defendant denies making any statements to the co-defendants Alwan or Al–Bakri about "receiving instruction on firearms and mountain climbing." T. 304–305. In fact, he points out that the Al–Bakri statement is inconsistent in that it states that "Galab, Yasein Taher and an unnamed individual arrived at the training camp before Al–Bakri and left before him." T. 306. If that is the case, how then, the defendant argues, could Al–Bakri have seen him at the camp "eating" or "doing anything at that particular location." T. 306.

The defendant submits that the government has not presented any evidence that he was "in possession of one of those Kalashnikovs or a long-distance rifle or handgun or explosives or any mountain climbing (sic)." T. 306.

He further asserts that the government has not presented any evidence establishing that "he ever was at any kind of guest house." T. 307. The government's proffer about "propaganda films about suicide, Jihad and the USS Cole" was that these were presented at the "guest houses." T. 307. Therefore, he asserts, since it has not been established that he was at any of these guest houses, he cannot be said to have been indoctrinated by these propaganda presentations. T. 307.

The government has not proffered anything for the period commencing June 27, 2001, that being the date the defendant returned from Pakistan, and ending with this arrest on September 13, 2002 that he possessed "any kind of a weapon, or even

having access to any kind of a weapon. No indication whatsoever that he had any sort of al-Qaida-related material. No indication whatsoever in any proffer, not only of any e-mail or the possession of any tapes that might have espoused acts of violence or anything of that kind. Nothing whatsoever that [he] was privy to or received any type of information." T. 308.

The government has failed to make a case against him and has failed in its burden to prove by clear and convincing evidence that he constitutes a danger to the community and has failed to establish that he is a risk for flight. T. 311.

Furthermore, there are conditions that the Court can impose in order to release the defendant on bail. T. 312.

The defendant "denies that he was ever a member of al-Qaida and denies that he is now a member of al-Qaida or has ever been a member of al-Qaida, or has any intention of being a member of al-Qaida." T. 339. The government has failed to present "proof of memberships by the defendant as [a] member of al-Qaida." T. 339.

The defendant denies that he knew "who it is that operated [the al-Farooq] camp." T. 340. The government knows "that at the time [the defendant was] allegedly in Afghanistan, that there were a number of factions of civil war going on within Afghanistan." T. 340.

Since the government has a great deal of intelligence information "with respect to activities in Afghanistan, it is obligated to come forward with information in any way that describes what the camp was for, what its purposes were, who operated it, and how it is that [the defendant] allegedly [was a] participant in it." T. 341.

The defendant also denies that he "took any sort of oath or pledge to become [a] member of al-Qaida" which he asserts is a requirement in order to become a member of al-Qaida. T. 341–342.

The government has failed to indicate how an "al-Qaida sleeper cell" operates or how any other foreign terrorist organization "sleeper cell" operates. The defendant denies being a member of a "sleeper cell terrorist organization." T. 342–352.

The defendant has never "seen the video, seen a transcript of this video, or [has] any knowledge of this particular video" referred to by the government as containing a speech of Osama bin Laden. T. 353.

The government also denies "any knowledge of having read what is depicted on this page of the [government's] exhibit" and further denies that he has "ever read the al-Qaida training manual or its introduction, nor [has he] ever had anyone read it to [him] or give [him] instruction with respect to the al-Qaida training manual." T. 353–354.

### Government's Rebuttal to Galab Proffer

The statements given by Alwan and Al-Bakri to the F.B.I. establish that he went to Afghanistan and attended the al-Farooq training camp. T. 371–372, 376, 377, 378, 382–383.

The government asserts that the defendant's silence about his trip to Pakistan contradicts his claim through counsel that he "loves this country and he's happy to be an American." T. 410. If this were true, the government argues, "he should have reported" what he saw and heard while on this trip. By not doing so, he constitutes a danger to the community. T. 410.

The government claims that there is an outstanding bench warrant issued on May 21, 1997 from the City of Niagara Falls. T. 415.

Alwan also stated as to this defendant that his "purpose of being in the camp was to receive training." T. 394.

The government asserts that the failure of the defendant to report what went on in Pakistan and Afghanistan, *i.e.*, the guest house lectures and the training camp events, is indicative of the secret nature of the defendant's activities and his non-disavowal of Osama bin Laden and the principles of al-Qaida thereby causing him to be a continuing danger to the community. T. 384–386. There was a "conspiracy of silence" among all of the defendants. T. 390.

### AL–BAKRI

The following is a synopsis of the government's proffer in support of its motion to have the defendant Mukhtar Al–Bakri detained on the basis that he constitutes a danger to the community and is a risk for flight.

The government says he was a member of group one who left for training camp in al-Farooq in May 2001. T. 63.

The government says he and Goba and Alwan stayed in Karachi, Pakistan for approximately one week, at which time they met Conspirator A. They met uncharged Co–Conspirator A within a few days of arriving in Karachi, and were made aware that they were going to meet "The Most Wanted" whom the government claims is the reference for bin Laden. T. 67. "When they heard this, [they] knew that they were going to Afghanistan to meet Mr. Osama bin Laden. ... With respect to Al–Bakri, he knew that making this trip was wrong." T. 67–68. He was "physically free to decline to travel to Afghanistan" and he "voluntarily, willingly and knowingly embarked on this trip, in order to proceed to the al-Farooq training camp." T. 68 He and Goba and Alwan "agreed to go to meet Mr. bin Laden" and "they first flew to Quetta, another area within Pakistan, and they met (sic) and thereafter went to Kandahar by car." T. 68.

While in Quetta, all three stayed in a guest house which they "were physically free to leave." T. 68. From there, he and Goba and Alwan went to another guest house in Kandahar where all three stayed for a week. T. 68–69.

At this guest house, they began receiving "indoctrination and training by al-Qaida members and other persons affiliated with the al-Qaida terrorist network." "They were shown, among other things, a movie about the destruction of the USS Cole, and how al-Qaida committed that particular terrorist act. There was (sic) also conversations about Palestine and Kashmir." They were "provided with anti-American indoctrination and anti-American sentiments." T. 69.

The government further contends that although all three, Al–Bakri, Goba and Alwan, were free to leave the guest house in Kandahar, they did not do so. However, "once there were twenty people assembled, including Al–Bakri, Goba and Alwan, the [entire] group drove to the al-Farooq training camp" which "was run and maintained by the al-Quida terrorist network and financed by it." T. 69. The government asserts that each defendant, to wit, Al–Bakri, Goba and Alwan was free to leave the camp and return home. T. 70.

The al-Farooq training camp was "dedicated to producing and training terrorist fighters for the al-Qaida cause." T. 72–73.

The government contends that Al–Bakri was given a "code name," *i.e.*, a name "different than [his] own" upon arrival at the camp and that he was "trained on the use of a variety of weapons" including "a Kalashnikov automatic weapon which is capable of firing a great many rounds of ammunition." T. 73.

He was also allegedly "trained in the use of handguns, long-range rifles" and "at least [was] shown and demonstrated the

use of C–4, TNT, and other explosives." T. 73–74.

The government further asserts that at any point during the stay "of this defendant at the al-Farooq camp, he was free to leave the camp, and this claim is supported by the fact that the defendant Alwan left the camp 'about ten days into the training' and that Alwan's departure from the al-Farooq camp demonstrates the freedom of movement of the defendants" and "demonstrates that it was [Al–Bakri's] conscious decision to remain at the camp and to complete the training and to thereafter be available, as the need may arise, depending on the interests of those that were training them." T. 74–75.

The government claims that Al–Bakri admitted that he traveled in the group with Goba, Alwan and uncharged Conspirator B [4], through Canada on to Afghanistan, and that he also provided information relating to uncharged Conspirator A. More specifically, "that uncharged Conspirator A met this same group of defendants while still at the hotel in Karachi". T. 97.

After a few days of their stay in Karachi, Pakistan, he and Goba, Alwan and uncharged Conspirator B were advised by uncharged Conspirator A that "they were going to see The Most Wanted, whom defendant Al–Bakri knew to be identical to Osama bin Laden". The government further asserts that the defendant Al–Bakri "admitted that what he was about to do, he knew was wrong." T. 97.

"The trip he made to Quetta, the airline flight, was paid for by the people who ran the guest house in Quetta." T. 98.

According to the government, Al–Bakri "acknowledged driving to Kandahar, going to a guest house there" and "viewing the movie about the USS Cole, how that particular terrorist act was committed." T. 98. He further stated that "while in Kandahar's guest house (sic) he was given a uniform" which he "wore at the al-Farooq camp on every day but Friday." T. 98.

The government states that Al–Bakri "admitted being trained on the use of the Kalashnikov, the handgun and the long rifle" and that the camp trainers "came from various countries of the Middle East and Africa." T. 102.

He advised that the defendant Alwan left the camp "approximately a week or two into training." T. 103.

While in the camp, he had contact with the defendants Galab, Taher and Mosed whom he knows as "Shafal." T. 103.

The government asserts that Al–Bakri has "indicated that while he was at the al-Farooq camp, he considered himself to be a member of al-Qaida" but that when "he left the camp he did not consider himself to be a member of al-Qaida." T. 103. He also acknowledged that bin Laden spoke at the camp "about the need to prepare and train" because "there was going to be a fight against Americans." T. 103–104.

Al–Bakri also allegedly stated that the defendant Goba was "the leader of the whole trip from Buffalo into the al-Farooq training camp." T. 104.

Al–Bakri also admitted that "he stayed an extra week, an extra period of time, perhaps as much as a week, at the training camp, as compared to the other defendants that he started with, those being Alwan and uncharged Conspirator B." T. 104. After leaving the camp, he "again met up with defendant Goba and uncharged Conspirator B in Kandahar." T. 104.

---

**4.** Once again, this appears to be a discrepancy or misstatement by counsel for the government since he previously identified "uncharged Conspirator B" as being the defendant, Al–Bakri. *See* T. 92.

The government found a firearm in the last known residence of Al–Bakri consisting of a .22 caliber single shot Derringer containing a single spent shell casing. T. 109.

The government asserts that Al–Bakri does not have a permit for a handgun. T. 108.

Also found within Al–Bakri's house was a rifle with a telescopic lens, *i.e.*, a single bullet bolt action rifle. T. 110.

The government argues that discovery of the aforesaid weapons in Al–Bakri's house support a claim of dangerousness to the community. T. 110.

Also seized was a cassette tape from Al–Bakri's house containing Arabic writing on the exterior which the government has translated as stating: "Call to Jihad" and that the tape allegedly contains "highly inflammatory anti-American and anti-Israeli sentiments." T. 110–111.

The government also asserts that he admitted on July 18, 2002 that he sent an e-mail to an uncharged co-conspirator in the western New York area which "was coded because he was aware that his conversations and communications could very well be monitored." T. 111–112. He also allegedly admitted that he "buried religious terms and phrases within the code." The e-mail was written in Arabic. T. 111–112.

The government further alleges that Al–Bakri admitted to the F.B.I. that the purpose of his e-mail of July 18, 2002 to the uncharged conspirator in western New York was to articulate **"a planned attack upon Americans involving explosives"** by al-Qaida upon Americans. T. 112–113 (emphasis added).

The government's translation of this e-mail entitled "Big Meal" is as follows:

How are you my beloved, God willing you are fine. I would like to remind you of obeying God and keeping him in your heart because the next meal will be very huge. No one will be able to withstand it except those with faith. There are people here who had visions and their visions were explained that this thing will be very strong. No one will be able to bare (sic) it.

T. 112–113.

Counsel for the government argues that the phrasing in the aforesaid e-mail:

There are people here who had visions and their visions were explained that this thing will be very strong

is peculiar and parrots the phrasing and concepts utilized by bin Laden in a speech made on December 31, 2001 in reference to the attacks of September 11, 2001 wherein he states:

We were at a camp of one of the brother's guards in Kandahar. This brother belonged to the majority of the group. He came close and told me that he saw, in a dream, a tall building in America, and in the same dream he saw Mukhtar teaching them how to play karate. At that point, I was worried that maybe the secret would be revealed if everyone starts seeing it in their dream. So I closed the subject. I told him if he sees another dream, not to tell anybody, because people will be upset with him.

T. 116.

Counsel for the government argues that a comparison of the language in the bin Laden speech with that used by Al–Bakri in his e-mail of July 18, 2002 indicates "Al–Bakri's continuing knowledge and certainly dissemination of a possible al-Qaida attack, terrorist attacks upon American citizens." T. 117.

### Al–Bakri Response

The following is a synopsis of the proffer made on behalf of the defendant Mukhtar Al–Bakri in response to the government's

proffer as to why he should be detained and also in support of his application for release on bail during the pendency of this case.

He joins in all of the arguments made on behalf of the co-defendants "regarding the statute and the presumptions." T. 313.

Although he admits to having been in Afghanistan, he contests the characterization and implications the government has asserted with respect to the guns found in the defendant's home, the e-mail referred to as "The Big Meal" and the cassette tape in support of its claim of "violence" and that the defendant.

The defendant left the United States in May of 2002 with his mother and father and brother for the purpose of getting married in Bahrain, and he did get married on September 9, 2002. This time in the Middle East was spent in preparation for his wedding, "including the payment of the dowry." T. 314.

He and his family spent July and August 2002 in Saudi Arabia with his sister who lives there, and while in Saudi Arabia, "he took part in the pilgrimage to Mecca." T. 315.

The family residence on Ingham Avenue in Lackawanna houses two families—the defendant, his brother and his father and mother as one, and the other consisting of his older brother, Ahmed, and Ahmed's wife and their two children. T. 315.

The government has not indicated where the guns were seized from in the residence. The rifle with the telescope belongs to the defendant's father and was removed from a closet in the father's bedroom. This weapon had been "purchased back in the 90s at a flea market." T. 316.

The single shot Derringer was found in the attic in a room occupied by the defendant, but the government has failed to establish whether this weapon, or for that matter, the rifle "could be used." T. 316.

The defendant also takes issue with the government's translation of the Arabic writing on the casing of the audio cassette tape. The defendant asserts that the translation should be: "An Invitation to Jihad" rather than "A Call to Jihad." The defendant asserts that from a linguistic perspective, "there's a big difference in the meaning of the word invitation versus the phrase call." T. 317–318. Also, the word jihad "has many meanings, one of [which] is struggle. In the religious sense, a jihad is a struggle between the forces of good and the forces of evil." T. 318.

The exterior case of the cassette tape also contains "the name of the individual who is heard on the tape by the name of Al–Katain. This particular tape, and others like it, were disseminated in the Arab community worldwide." T. 318. However, Al–Katain has not been heard from "since Iraq invaded Kuwait in 1991" and therefore, "the most recent (sic) that this tape could have been made would have been twelve years ago." T. 318. It is believed that this tape "was made somewhere between 1979 and 1982." T. 318. The government's translation "an Islamic nation will not submit to a white house or bow to a red house" and the actual content of the tape refer "to the Russian invasion of Afghanistan, it refers to events that happened twenty years ago. It is not a call to any kind of immediate action that would cause this particular exhibit in any way to be interpreted as [the defendant's] tendency to show any kind of violence to the community at the present time." T. 318–319.

This tape, "most likely [was] financed in part by the United States of America. At the time [the tape] was made, when the Russians invaded Afghanistan, we were supporting the Mujahidin, who eventually

caused the problems in Afghanistan." T. 319.

As to the "Big Meal" e-mail, the defendant asserts that it was sent in July 2002 from Saudi Arabia as a result of what he was told "by an old man" and a "taxi driver who was also involved in the conversation." T. 321–22.

Approximately a week after this conversation, he heard that "an explosion was going to happen in Saudi Arabia, but he had no other information." T. 323.

The e-mail was not based on "firsthand information" and was not such "that would lead one to conclude that this is some sort of call to action or call to arms." T. 323.

The government has failed to establish that the defendant "is a cause for any kind of immediate concern for safety in the community." T. 323.

The defendant "denies that he was ever a member of al-Qaida and denies that he is now a member of al-Qaida or has ever been a member of al-Qaida, or has any intention of being a member of al-Qaida." The government has failed to present "proof of memberships by the defendant as [a] member of al-Qaida." T. 339.

The defendant denies that he knew "who it is that operated [the al-Farooq] camp." The government knows "that at the time [the defendant was] allegedly in Afghanistan, that there were a number of factions of civil war going on within Afghanistan." T. 340.

Since the government has a great deal of intelligence information "with respect to activities in Afghanistan, it is obligated to come forward with information in any way that describes what the camp was for, what its purposes were, who operated it, and how it is that [the defendant] allegedly [was a] participant in it." T. 341.

The defendant also denies that he "took any sort of oath or pledge to become [a] member of al-Qaida" which he asserts is a requirement in order to become a member of al-Qaida. T. 341–342.

The government has failed to indicate how an "al-Qaida sleeper cell" operates or how any other foreign terrorist organization "sleeper cell" operates. The defendant denies being a member of a "sleeper cell terrorist organization." T. 342–352.

The defendant has never "seen the video, seen a transcript of this video, or [has] any knowledge of this particular video" referred to by the government as containing a speech of Osama bin Laden. T. 353.

The defendant also denies "any knowledge of having read what is depicted on this page of the [government's] exhibit" and further denies that he has "ever read the al-Qaida training manual or its introduction, nor [has he] ever had anyone read it to [him] or give [him] instruction with respect to the al-Qaida training manual." T. 353–354.

### Government's Rebuttal to Al–Bakri Proffer

The defendant admits, though his lawyer, that he was in Afghanistan. T. 367.

The defendant gave a statement to the F.B.I. on September 11, 2002, the contents of which have not been denied by the defendant. T. 367.

Alwan in his statement given to the F.B.I. states that the defendant attended the al-Farooq training camp. T. 376.

The defendant admitted in his statement that while at the al-Farooq camp, he was "a member of the al-Qaida" and that he was "undergoing advanced training in anti-aircraft weaponry." T. 378.

The defendant admitted that "he was told he was going to see The Most Wanted, saw a movie about the USS Cole, how they did it, and also talked about Palestine and

Kashmir." T. 416. He also provided "the regimen at the al-Farooq camp." T. 416.

"When he was at the camp, he was al-Qaida." T. 417.

Alwan also stated as to this defendant that his "purpose of being in the camp was to receive training." T. 394.

The government asserts that the failure of the defendant to report what went on in Pakistan and Afghanistan, *i.e.*, the guest house lectures and the training camp events, is indicative of the secret nature of the defendant's activities and his non-disavowal of Osama bin Laden and the principles of al-Qaida thereby causing him to be a continuing danger to the community. T. 384–386. There was a "conspiracy of silence" among all of the defendants. T. 390.

### SYNOPSIS OF GOVERNMENT'S SUPPLEMENTAL PROFFER OF EVIDENCE, AFFIDAVIT OF WILLIAM J. HOCHUL, JR., SWORN TO SEPTEMBER 27, 2002

"In mid-June, 2001, the government received information which first raised suspicion regarding the defendants and their possible attendance at an Usama bin Laden terrorist training camp in Afghanistan," but because of insufficient information "upon which to effectuate an arrest at this time," no arrests were made. ¶ 3.

An investigation was commenced and "a number of pro-active measures to protect the community" were undertaken, including, at times, "around-the-clock surveillance of some of the defendants which surveillance," it is believed, "was observed by those defendants." ¶ 3.

Additional information has been obtained by the government as a result of the ongoing investigation being conducted in this case, and it is as follows:

### The Defendant Goba:

Multiple audio cassette tapes were retrieved by investigators pursuant to a search warrant at his last known address, *i.e.*, 21 Wilkesbarre, Apartment 2, Lackawanna, New York, and according to translators working for the F.B.I., three of the cassette tapes appear to be highly incendiary in nature, and bear specifically upon the question of whether the defendant poses a danger to the community.

More specifically, … one of the tapes is entitled 'Caravan of Martyrs' and contains sounds of battlefields (heavy artillery), and references to such concepts as 'Jihad is a duty,' a person's existence is to live and die for Jihad, and become a martyr. A second tape is entitled 'Koranic Recitations' and contains multiple statements from the Koran calling for fighting and milartistic action (e.g. 'fight them until there is no more dissension, and all religions become Allah's). ¶ 7.

The government asserts that the aforesaid quoted statements "are of the type frequently quoted by radical Muslim clerics as justifying terrorist attacks." ¶ 7.

"Tape three is entitled 'Processions of the Martyrs' and contains songs with lyrics calling for fighting, revenge, and for community suicide missions." ¶ 7.

Because of these tapes and the alleged inflammatory content therein, the government asserts that this defendant must be detained. ¶ 7.

### The Defendant Alwan:

Joint Terrorism Task Force ("JTTF") agents seized "multiple cassette tapes of a militant nature," one of which is entitled 'Future of the Islamic Nation.' It is claimed that "this tape contains a recorded lecture of a Sheik Safar Al–Hawali" who allegedly "is a radical Saudi cleric associated with the same Saudi dissident organization that Usama bin Laden was formerly

associated with." It is proffered that this "tape calls for fighting 'the West,' invading Europe and America with Islam, and that America is an enemy." ¶ 8.

"A second tape is titled 'When the Stone Speaks' and contains pro-Palestinian, anti-Israeli propaganda" and "equates 'jihad' with the Palestinian 'intifada.'" ¶ 8.

"A third tape also contains teachings of being a martyr, and of the jihad." ¶ 8.

### The Defendant Mosed:

The government asserts that this defendant, "since at least 1997, has used multiple names, including Shukry Elbaneh, and at least two different social security numbers," and "at the time of his arrest on September 13, 2002, [he] had two social security cards in his wallet in different names, all of which appear to be variations of the names of the defendant, his wife and his brother." This evidence, the government submits, "further demonstrates that the defendant poses a risk of flight based upon his ability and inclination to use different identifying information." ¶ 5.

The government further proffers that a Panther stun gun was retrieved from the residence of the defendant pursuant to a search warrant and that such an instrument demonstrates "that the defendant also poses a danger to the community insofar as there is no legitimate use for this type of weapon." ¶ 6.

### The Defendant Galab

The government proffers that the defendant "has used an alias in the past. Specifically, [he] used the name Faysal Benamah when he was issued a ticket by law enforcement on August 10, 1997." ¶ 9.

### The Defendant Al–Bakri:

The government submits that "tests conducted upon the .22 caliber Derringer found inside [the defendant's] dresser reveals that the gun contains a 'smooth bore.' Based upon this fact, the firearm found within this defendant's dresser is a weapon prohibited by federal law, to wit: 26 U.S.C. § 5861(d)." ¶ 10.

### The Defendant Taher:

A search of the defendant's "wife's" apartment at 5570 South Park Avenue, Hamburg, New York on September 25, 2002 produced a document in a folder containing personal papers of the defendant, which document "consists of a multi-page document which defends the use of suicide attacks (which the documents calls 'martyrdom operations') as a legitimate weapon to be used against an 'enemy.'" ¶ 13. Portions of the document are quoted by counsel for the government (¶ 14), and counsel further editorializes as to the contents of the document as containing "arguments based upon the Koran as purportedly justifying such attacks." ¶ 15.

The government proffers that the defendant has "used an alias in the past" and that this supports its claim that the defendant constitutes "a risk of flight based upon his ability and inclination to use different identifying information." ¶ 16.

### The Timing of the Defendants' Appearance at the Al–Farooq Camp:

The information supplied by the defendant, Al–Bakri, establishes that "training at the al-Farooq camp lasted five weeks" and that he remained "an extra week (for a total of six weeks) so that he could get extra help." ¶ 11.

The travel documentation of the defendants submitted by the government establishes "that the defendants Taher, Galab and Mosed departed the United States for Pakistan on April 28, 2001 and returned to the United States on June 27, 2001, a total of eight weeks." ¶ 11.

A review of Air Canada passenger logs confirms that the defendants Goba, Alwan, Al–Bakri and Conspirator B "all departed Pearson Airport in Canada on May 12,

2001" for Karachi, Pakistan. The government asserts that this information "directly corroborates information previously provided to the Court" to establish that there was a time period when all of the defendants were at the al-Farooq training camp at the same time. ¶¶ 11, 12.

*GOVERNMENT'S SECOND SUPPLE-MENTAL PROFFER OF EVI-DENCE AFFIDAVITS OF MARTIN J. LITTLEFIELD SWORN TO OC-TOBER 2, 2002*

In the first affidavit filed by Mr. Littlefield on October 2, 2002 at 3:09 p.m., he describes additional evidence that was developed by the government relating to the making of travel arrangements by the defendants Mosed, Taher and Galab for their trip to Pakistan in April 2001.

I have considered the responses of each of these three defendants to the contents of the Littlefield affidavit and the application of same to the issues at hand and hereby conclude that whether misinformation was given by the defendants to a travel agent or not is of no legal consequence as far as the decision herein is concerned, and I have not given any weight to this affidavit in reaching my decision.

In the second affidavit filed by Mr. Littlefield on October 2, 2002 at 4:48 p.m., it appears to me that this affidavit modifies the September 27, 2002 affidavit of William J. Hochul, Jr. with respect to quoted recitations from an audio cassette tape entitled "Koranic Recitations" wherein it is now stated by the government's counsel that the tape contains statements found in the Koran that "radical clerics of Islam" rely on to justify "violence."

As to this second Littlefield affidavit, I have also considered the responses made to it by each defendant and have considered the positions of all parties herein in the context of the total context of all of the evidence proffered.